**BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTER-NATIONAL PENSION FUND,**

v.

**NEW WORLD PASTA COMPANY.**

No. CIV.A. DKC 2003–0990.

United States District Court, D. Maryland.

March 24, 2004.

Julia Penny Clark, Bredhoff and Kaiser PLLC, Washington, DC, for Plaintiff.

David William Stamper, Richard J. Hafets, Piper Rudnick LLP, Baltimore, MD, Roxane Sokolove Marenberg, Piper Rudnick LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution are: (1) the motion of Defendant New World Pasta Co. (NWP) to dismiss under Fed. R. Civ. Pro. 12(b)(6) and (2) the motion of Plaintiff Bakery and Confectionary Union and Industry International Pension Fund (Pension Fund) for summary judgment under Fed. R. Civ. Pro. 56(b). The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, the court will: (1) deny Defendant's motion to dismiss and (2) grant Plaintiff's motion for summary judgment.

## I. Background

### A. Factual Background

Plaintiff is an employee benefit plan within the meaning of Section 3(2) and 3(3) of the Employee Retirement Income Security Act, (ERISA), 29 U.S.C. § 1002(2) and (3), and a multiemployer pension plan within the meaning of 29 U.S.C. § 1002(37). Created in 1955 through an Agreement and Declaration of Trust (Trust Agreement), the Pension Fund currently has over 200 participating employers with more than 750 separate accounts nationwide. It is operated and administrated by a board of trustees, which is comprised of an equal number of trustees appointed by participating employers and union representatives. The purpose of the Pension Fund is to provide retirement benefits for employees working in the baking and confectionery industry. These benefits are funded by participating employers through periodic contributions.

Defendant NWP, a Pension Fund participating employer, was formed in 1999. In the same year, NWP acquired Hershey Foods Corporation's Lebanon, Pennsylvania plant (Pennsylvania plant). Prior to

the acquisition, NWP had no dealing with the Local Union or the Pennsylvania plant. *See* paper no. 12, at 20. On or about July 1, 2001, NWP and the Bakery, Confectionery and Tobacco Workers International Union, Local 464 (Local Union) entered into a collective bargaining agreement (CBA) covering certain employees working at the Pennsylvania plant. The CBA was effective for the term May 1, 2001 to April 30, 2005 and required Defendant to make contributions to the Pension Fund on behalf of those covered employees.

Article XVII, section 17.2, of the CBA provides that the company agrees to pay a specific amount for each hour for which an employee receives pay, "based on a maximum of 2080 hours per year, payable at no more than (forty) 40 hours per week." *See* paper no. 3, ex. 1, § 17.2. Section 17.1 of the same article provides that the company agrees "to be bound as a party by all the terms and provisions of the [Trust Agreement] dated January 13, 1958, as amended ... and said Agreement is made part hereof by reference." *Id.*, § 17.1.[1]

Pursuant to the Trust Agreement, "[a]n employer may become a party to this Trust Agreement only by executing such written instruments as the trustees may, from time to time, prescribe, and acceptance by the trustees of such an Employer shall be based on the representations set forth by the employer in such written instruments." *See* paper no 3, ex. 6, art. IX, § 2.[2]

One such document adopted by the trustees for participation in the Pension Fund

is the Standard Collective Bargaining Clause [Standard Clause]. The dispute in this case centers on a Standard Clause that Plaintiff contends was executed by NWP and the Labor Union on July 30, 2001. *See paper no 3*, ex. 4, ¶ (a). The Standard Clause was signed by Lesley J. Brink, Plant Controller, on behalf of NWP, and by Dennis A. Bomberger, Business Agent, on behalf of the Local Union. Defendant contends, as will be explained below, that the person who signed on behalf of NWP was not authorized to do so, if the clause is applied as Plaintiff contends it should be.

The Standard Clause provides:

For each hour or portion thereof, for which an employee, subject to the Collective Bargaining Agreement, receives pay, the Employer shall make a contribution of $1.04 to the ... Pension Fund, up to a maximum of 40 hours in any week.

*Id.*, ¶ (b). Paragraph (g) provides that the Standard Clause "encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirement." *Id.*, ¶ (g).

In a letter dated October 29, 2001, NWP informed the Pension Fund that it intended to close the Pennsylvania plant. On or about October 31, 2001, NWP and the Local Union entered in to a Plant Closing Agreement (PCA), which provided that any employee terminated as a result of the plant's permanent closure shall be paid "severance pay in accordance with Article

---

**1.** When NWP acquired the Pennsylvania plant, it assumed the previous Hershey Collective Bargaining Agreement, which ran from January 1, 1998 until April 30, 2001. The prior Hershey CBA contained a 2080 hour annual cap on pension contributions identical to the one at issue in this case. Defendant contends that this limitation was accepted in practice without objection by all parties, including Plaintiff.

**2.** Additionally, the Trust Agreement requires any employer participant to designate an "Employer Trustee" to represent the company in the operation and administration of the Pension Fund. *See* paper no. 3, ex. 6, Art. III, § 7. Actions taken by the Employer Trustee on behalf of the company are binding. *Id.*

17.8 of the Collective Bargaining Agreement." *See* paper no. 3, ex. 2, ¶ 1. NWP's obligations with respect to accrued vacation pay, COBRA continuation, life insurance, retiree health coverage, incentive pay, and holiday pay are specifically addressed in paragraphs 2–7 of the agreement. Paragraph 8 addresses all other employee benefits, stating:

> All other benefits provided to employees in the Collective Bargaining Agreement, including but not limited to Accident and Sickness Benefits, will remain in effect in accordance with the Collective Bargaining Agreement until the date of an employee's termination or the date of the closure of the Plant, whichever occurs sooner.

Paper no. 3, ex. 2, ¶ 8. The PCA also states:

> [The parties] agree that the terms of this Agreement constitute the entire agreement and understanding regarding the matters covered hereby. . . . This Agreement supercedes any and all previous discussions, agreements and/or understandings between the parties, and the terms of this Agreement may not be modified or superceded except by a subsequent written agreement signed by authorized representatives of the Company and the Union.

Paper no. 3, ex. 2, ¶ 13. The PCA is signed by Dennis A. Bomberger on behalf of the Local Union and Cicel A. Archbold on behalf of NWP.

Most employees at the Pennsylvania plant were terminated on or about November 20, 2001. Pursuant to the PCA, each employee received severance and accrued vacation pay. The remaining employees continued to work under the terms of an Extended Operations Agreement (EOA), until December 21, 2001.[3] Each employee in the second group of terminations also received severance and accrued vacation pay.

Plaintiff alleges that, after the plant closed, NWP was to pay contributions to the Pension Fund for the severance pay and accrued vacation pay received by the two groups of terminated employees on December 10, 2001 and January 10, 2002, respectively. Defendant, however, failed and refused to pay contributions to the Pension Fund in excess of 2080 hours per employee for the year 2001. Instead, NWP informed the Pension Fund that it construed the PCA as having terminated the Standard Clause and therefore it was not obligated to make pension contributions on severance or accrued vacation pay in excess of the hour limit specified in the CBA and the PCA. *See* paper no. 9, ex. 3, ¶ 9.

**B. Procedural Background**

On April 4, 2003, Plaintiff filed a complaint against NWP, alleging that NWP's failure to make the required contributions on the entire severance package received by each terminated employee is a breach of its obligations under the Standard Clause and the Trust Agreement, and is a violation of § 515 of ERISA, 29 U.S.C. § 1145. *See* paper no. 1, ¶ 30. Plaintiff contends that the Standard Clause is the "sole and total agreement" between NWP

---

**3.** The EOA provides:

> work will be performed under the terms and conditions of the collective bargaining agreement, which shall remain in effect for the duration of this extension, and until such time as the plant is closed pursuant to paragraph 10 of the October, 31, 2001, agreement.

> All other benefits will be covered as per the October 31, 2001 Agreement.

Paper no. 3, ex. 3. The EOA also references the "severance package agreement made on October 31, 2001, between NWP and [Local Union]." *Id.*

and the Local Union with respect to pensions or retirement and was properly relied on by the Pension Fund in providing pension benefits to NWP's employees. Based on the language of the Standard Clause and the trustees' longstanding policy ·governing contributions on severance pay, Plaintiff contends that the 2080 hour per year limit on contributions in the CBA and PCA is not effective as against the Pension Fund.

Defendant filed a motion to dismiss on June 26, 2003, arguing that Plaintiff's reliance on the language of the Standard Clause does not give rise to a cause of action because (1) the PCA, which contains the 2080 hour limit, supersedes the Standard Clause, (2) the Standard Clause specifically incorporates the CBA, including its annual 2080 work hour limit on pension contributions, and (3) NWP's obligations under the Standard Clause are consistent with its obligations under the CBA and do not require contributions to the Pension Fund in excess of the stated maximum of 2080 work hours per year. Plaintiff filed a joint opposition and motion for summary judgment on July 28, 2003. Plaintiff argues that (1) the CBA incorporates the Standard Clause, which, by its terms and in accordance with longstanding policy, does not impose contribution limits on severance pay and pro rata vacation, and (2) NWP could not modify the terms of the Standard Clause without consent of the Pension Fund and, therefore, the PCA is not binding. The parties also dispute whether the Standard Clause was signed by an authorized agent on behalf of NWP,

and, if relevant, whether NWP had actual or constructive notice of the Trustees' interpretation of the Standard Clause. Plaintiff now seeks damages in the amount of $56,613.86 for delinquent contributions, plus interest, liquidated damages and attorney's fees and costs.

## II.  Standard of Review

Defendant has moved to dismiss Plaintiff's complaint for a failure to state a claim pursuant to Fed. R. Civ. Pro. 12(b)(6). Attached to Defendant's complaint were the documents referenced in Plaintiff's complaint.[4] In response, Plaintiff filed a combined opposition and motion for summary judgment. Defendant filed an opposition to Plaintiff's motion and a reply to Plaintiff's opposition. In light of the fact that both parties have had notice and ample opportunity to review each of the relied upon documents and arguments set forth, the court will proceed as on cross-motions for summary judgment.

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.

---

**4.** Defendant contends, and Plaintiff agrees, that because each of the attached documents were identified and referred to in Plaintiff's complaint, conversion of the motion to one for summary judgment is not necessary. Not all of the documents were properly attached, however. While the PCA, attached as exhibit 2, may have been identified and referred to in the complaint, it was not *relied upon* by Plain-

tiff in asserting its claim. *See Biospherics, Inc. v. Forbes, Inc.,* 989 F.Supp. 748, 749 (D.Md.1997). Nonetheless, because the parties have had full opportunity to review and brief all of the arguments and documents submitted, the court will proceed to the merits as presented in Plaintiff's motion for summary judgment.

*Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. In *Celotex Corp.,* the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the non-

moving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Analysis

■■■ Section 515 of ERISA, governing multiemployer plans, provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Congress enacted section 515 to allow multiemployer plans to "rely upon the terms of collective bargaining agreements and plans as written, thus 'permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law ....' " *Cent. Penn. Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1103 (3rd Cir.1996).[5] In keep-

---

**5.** As explained by one court:

Multiemployer plans, such as the Funds, operate on a so-called "defined-contribu-

ing with this intent, Section 515 acts so as to bind the parties to a collective bargaining agreement by the terms of their agreement, regardless of their undisclosed intent. *See Bakery and Confectionery Union and Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir.1997). Although not a party to the controlling documents, a multiemployer plan can enforce, as written, the contribution requirements of the documents and is not subject to the understandings or defenses available to the original parties. *See Bakery and Confectionery Union and Indus. Int'l Health Benefits and Pension Funds v. New Bakery Co.*, 133 F.3d 955, 959 (6th Cir.1998). As noted by this circuit, "[b]y allowing multiemployer funds to enforce the literal terms of an employer's commitment, section 515 increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Ralph's Grocery*, 118 F.3d at 1021–22. Finally, section 515 "creates a federal right of action independent of the contract on which the duty to contribute is based." *Id.* at 1021.

Pursuant to section 515, the court must examine the plan documents and all documents comprising the collective bargaining agreement to determine the scope of NWP's obligation to make contributions to the Pension Fund. The parties agree that

the CBA contains a limitation on NWP's pension contribution to 2080 hours per employee in any year. The dispute arises, however, over what, if any, effect the Standard Clause and PCA have on the CBA's contribution limit. Plaintiff argues that the Standard Clause governs NWP's contribution obligation and can not be read, and has not been interpreted, as to include a 2080 hour per year maximum. Defendant argues that the terms of the CBA were incorporated into the Standard Clause and that, even if not incorporated, the Standard Clause was superseded by the PCA. Moreover, Defendant contends that even if the Standard Clause governs, by its terms, it still imposes a 2080 hour per year maximum and that Mr. Brink lacked authority to enter into any amendment of the CBA on behalf of NWP.

### A. The Standard Clause

#### 1. Whether the Standard Clause Governs NWP's Contribution Obligation

■ The parties' initial dispute is whether the Standard Clause incorporates, or was incorporated into, the CBA. If, as Plaintiff contends, the Standard Clause is incorporated into the CBA, then NWP is obligated to make contributions on the severance pay and accrued vacation pay. The court finds that such an obligation exists.

tion in, defined-benefit out" basis. That is, this type of plan promises to pay out to beneficiaries a defined rate of benefits, which the plan calculates in reliance on participating employers' promises to pay in a defined rate of contributions. The rates at which individual employers promise to pay in to the plan are set forth in written agreements. These agreements often take the form of collective bargaining agreements entered into between an employer and a union, which name the plan as a third-party beneficiary. When, for whatev-

er reason, an individual employer breaks its promise to contribute at the rate defined in the written agreement, other participating employers must contribute at higher rates, or the plan must default on its own promises to beneficiaries.
*Trustees of Four Joint Boards Health and Welfare and Pension Funds v. Penn Plastics, Inc.*, 864 F.Supp. 342, 345–46 (S.D.N.Y.1994). *See also Cent. States Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 (7th Cir.1989).

Defendant argues that the CBA is incorporated into the Standard Clause because the Standard Clause contains language that incorporates the Trust Agreement, which in turn requires the rate of contributions to be governed by the CBA. While the Trust Agreement does in fact permit the employer and union to determine the rate of contribution, there is no evidence that it was intended to deprive the Pension Fund of its right "to impose uniform participation requirements and to rely on the representation agreed to by the Company and the Union in a standard clause." *Ralph's Grocery*, 118 F.3d at 1025. Standard clauses are a method by which a pension fund achieves uniformity among its many participating employers. Addressing a similar dispute over an employer contribution obligation under the same Trust Agreement and Standard Clause, the Fourth Circuit, in *Ralph's Grocery*, explained:

> The Fund uses the standard clause to achieve a uniform standard of participation for all participating employers. By means of the standard clause, the Fund requires every employer to agree to make contributions at the specified rate, to be bound by the trust's terms and conditions, and not to enter into any additional agreements with the union regarding pensions.

*Id.* at 1024. Here, as in *Ralph's Grocery*, the Trust Agreement explicitly reserves the right to impose obligations upon participating employers by requiring the execution of written instruments as prescribed by the trustees. *See* paper no. 3, ex. 6, Art. IX, § 2. The Standard Clause was one such instrument and was the means by which the Pension Fund ensured uniform compliance with the Trust's terms and conditions as to contributions.

Defendant, however, contends that the Standard Clause incorporated the CBA and, as a consequence, the terms of the CBA are still governing. Defendant relies on the requirement in the Standard Clause that NWP contribute $1.04 "[f]or each hour, ... for which an employee, subject to the Collective Bargaining Agreement, receives pay." Paper no. 3, ex. 4, ¶ (b). Defendant argues that the phrase "subject to the CBA" evidences the intent to make the CBA, and therefore the 2080 hour maximum, a part of the Standard Clause. The same argument was advanced, and rejected by the Fourth Circuit, in *Ralph's Grocery*. There, the parties' main agreement expressly stated that the employer was not required to make contributions for severance pay. A subsequent Standard Clause, virtually identical to the one in this case, stated otherwise. Looking to the rules of grammar, the court deemed the phrase "subject to the CBA" merely a qualifying phrase that clarified which employees were in fact referenced. This interpretation was regarded the more plausible construction of the phrase as finding otherwise would render the standard clause useless. In this case, the language of the Standard Clause is in all material respects identical to the one in *Ralph's Grocery*.

Defendant's argument that the Standard Clause incorporates the CBA is further defeated by language in the Standard Clause expressing the parties' understanding that it was the sole agreement relating to pensions. Paragraph (g) of the Standard Clause states: "This clause encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirement." *See* paper no. 3, ex. 4, ¶ (g). When confronted with the same language in the Standard Clause at issue in *Ralph's Grocery*, the Fourth Circuit explained:

> By agreeing to this language, the Company unambiguously represented that it had not agreed with the union on any other terms relating to pensions. By virtue of section 515, the Fund is permit-

ted to rely on and enforce the literal meaning of the Company's representation. In other words, the Fund was entitled to assume that, as promised, the standard clause was the parties' complete agreement on pensions. The Fund was not required to comb through the other parts of the collective bargaining agreement searching for additional terms related to pensions. *See Central Pennsylvania Teamsters Pension Fund v. W & L Sales, Inc.,* 778 F.Supp. 820, 830 (E.D.Pa.1991). Instead, because the Fund was permitted to rely on the standard clause's representation of completeness, additional pension terms set forth outside the standard clause do not alter the company's obligation to the Fund.

*Ralph's Grocery,* 118 F.3d at 1023–24; *see also New Bakery,* 133 F.3d at 959–61. In keeping with the purposes of section 515, the Pension Fund is entitled to rely on the "sole agreement" language of the Standard Clause and the representations made by NWP and the Local Union. Accordingly, the Standard Clause was incorporated into the CBA and, to the extent that the CBA applies, governs NWP's obligation to make contributions.

### 2. Whether the Standard Clause Requires Contributions Based on Severance Pay

■ Defendant argues that, even if the Standard Clause is incorporated into the CBA, it imposes the same limitation on NWP's contribution obligation as that contained in the CBA. According to Defendant, the Standard Clause limits NWP's contribution obligation to 2080 hours per employee annually. The court disagrees.

The Standard Clause requires contributions to the Pension Fund of $1.04 "[f]or each hour, ... for which an employee, subject to the Collective Bargaining Agreement, receives pay." On its face, NWP is required to make a contribution for each hour of "pay" received by an employee. The agreement contains no limitations as to what constitutes pay, nor can it be argued that severance and accrued vacation pay are not a viable type of pay. *See Ralph's Grocery,* 118 F.3d at 1025; *see also Bakery & Confectionery Union v. United Baking, Co.,* 495 F.Supp. 170, 171 (W.D.Pa.1980)(finding severance pay contributions when employer agreed to make contributions "for each day or portion thereof on which an employee subject to the collective bargaining agreement receives pay"). Thus, by its own terms, the Standard Clause requires pension contributions on severance pay and accrued vacation pay.

### 3. Whether the Standard Clause Imposes a 2080 Hour Per Year Maximum On Contributions

The parties next dispute whether the terms of the Standard Clause impose a 2080 hour per year maximum on pension contributions. Defendant argues that even if the Standard Clause governs its contribution obligation, paragraph (b) of the Standard Clause imposes the same 2080 hour limitation as that contained in the CBA. Defendant compares Article 17.2 of the CBA, which requires contributions for each hour for which an employee receives pay "based on a maximum of 2080 hours per year, payable at no more than (forty) 40 hours per week," with the language of paragraph (b) of the Standard Clause, which requires contribution "up to a maximum of 40 hours in any week." According to Defendant, the application of standard mathematical reasoning renders paragraph (b)'s weekly limit of 40 to be an equivalent of the annual limit of 2080 hours; that is, 52 weeks/year X 40 hours/week = 2080 hours. Plaintiff, in response, disputes Defendant's mathematical reasoning and argues that the trustees have interpreted the Standard Clause as requir-

ing pension contributions on *all* severance pay and accrued vacation pay, without regard to stated maximums. Plaintiff contends that such an interpretation has been repeatedly communicated to participating employers, including the Company. Thus, by agreeing to be bound by the Trust Agreement, NWP also agreed to be bound by the actions and decisions of the trustees.

Despite NWP's attempt to argue otherwise, the language of the paragraph (b) is not identical to that of the CBA and, on its face, fails to make any mention of a 2080 hour per year maximum. Defendant provides no support for its plea for the court to read into paragraph (b) language that simply does not exist. The obvious omission of any mention of an annual limit suggests that the Pension Fund did not intend for the 2080 hour maximum to be carried over into the Standard Clause. Furthermore, applying Defendant's reasoning and imposing the identical limitation as that in the CBA renders the Standard Clause unnecessary. Based on the record before it, the court will not read into the Standard Clause language that simply does not exist.

Moreover, the explicit language of paragraph (b) and its use of the word "any" also contradict Defendant's argument that the Standard Clause mathematically imposes an annual maximum on employer contributions. "Any" is defined as: "One, some, every, or all without specification" and "exceeding normal limits, as in size or duration." *See* The American Heritage Dictionary of the English Language, 4th ed., 2000. Applying this meaning here is compatible with the characteristics of the employee benefits at issue. When an employee receives deferred compensation, it is generally paid out in a single payment and may consist of severance or vacation time that extends beyond the numerical confines of the calendar year. The lan-

guage of the clause and the use of the word "any" indicates that the trustees were anticipating the accumulation of time and intended that there not be a limit in terms of a calendar year. Thus, in accordance with the plain language of the Standard Clause, NWP's obligation to make pension contributions on severance pay is not limited to a maximum of 2080 hours per year.

## B.  The Plant Closing Agreement

██  Defendant contends that, even if the Standard Clause applies, the PCA supersedes any previous agreement governing its contribution obligation. Defendant argues that, under standard contract law principles, it is permitted to modify previously agreed upon terms and to rely on the integration clause of the PCA, which states that the parties agree that the PCA "supercedes any and all previous discussions, agreements and/or understandings" and "constitute[s] their entire agreement and understanding regarding the matters covered hereby." *See* paper no. 3, ex. 2, ¶ 13. Defendant further contends that the PCA is not contrary to the purposes of section 515 as it merely reaffirms the agreed upon terms of the CBA and does not result in a modification of the CBA.

██  While NWP correctly recites the traditional rules of contract construction, such as integration clauses, these rules apply to collective bargaining agreements only to the extent that they do not conflict with section 515. *See Bituminous Coal Operators' Ass'n, Inc. v. Connors,* 867 F.2d 625, 635 (D.C.Cir.1989). It is well understood that Section 515 "entitles pension funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to pension contributions." *Id.* at 633. The Pension Fund's reasonable reliance on an employer's promise should not be frustrated

by subsequent negotiations involving only NWP and the Local Union. *See Penn Plastics*, 864 F.Supp. at 347. Rather, "[s]ound national pension policy demands that employers who enter into agreements providing for pension contributions not be permitted to repudiate their pension promises." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 548 n. 15, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988).

The CBA in this case consists of the initial agreement and the incorporated Standard Clause. The negotiation and execution of the PCA involved only NWP and the Local Union; the Pension Fund had no involvement whatsoever, nor did it receive notice of the agreement until months after the closure of the Pennsylvania plant.[6] Permitting the reconsideration of the promises made by NWP and the Local Union months after entering into the Standard Clause creates a direct conflict with the purposes of section 515. *See Penn Plastics*, 864 F.Supp. at 347. Thus, NWP's contribution obligations on pension plans are governed by the Standard Clause, as incorporated into the CBA, and not the PCA, as a matter of law.[7] As such,

NWP is obligated to make contributions on severance pay and accrued vacation pay without regard to annual maximums.

## C. Binding Nature of the Standard Clause

■ Finally, Defendant argues that, even if the Standard Clause is found to control and require contributions on severance pay, NWP is not bound by the agreement because it was signed by someone who lacked binding authority. Defendant contends that the signature on the Standard Clause, that of Les Brink, an employee at the Pennsylvania plant, was obtained secretly and fraudulently by "Mr. Bomberger, apparently acting as an agent for Plaintiffs." Paper no. 12, at 10.[8] Plaintiff responds by arguing that Mr. Brink possessed apparent authority to enter the agreement as a matter of law and that NWP ratified his action by accepting the conferred benefits.

■ A corporation is bound by the acts of its agent where those acts are performed by any express grant of power or within the agent's implied or apparent authority, unless the agent acted for his

---

**6.** While it is not immediately clear as to when Plaintiff received actual notice of the PCA, Defendant concedes that notice was not sent until, at the earliest, March, 2002. *See* paper no. 12, ex. 1 (Mr. Hafets' Declaration, ¶ 14, discussing when he provided written notice to the Pension Fund of the PCA).

**7.** Even assuming the validity of the PCA, enforcement of the agreement would not alter NWP's obligation to make contributions on severance and accrued vacation pay. The PCA provides that pension benefits shall remain in accordance with the CBA. *See* paper no. 3, ex. 2, ¶ 8. As stated previously, the CBA consists of both the initial agreement and the Standard Clause. Thus, to the extent that the PCA is valid, it reinforces the contribution obligations as specified in the Standard Clause. Accordingly, even assuming the PCA's validity, NWP is still obligated to make

contributions on severance pay and accrued vacation pay without regard to a 2080 hour annual maximum.

**8.** Defendant contends that Mr. Bomberger knew that Mr. Brink was not authorized to act on behalf of NWP for pension negotiations, but that he obtained the signature deliberately and secretly "because he knew, and Plaintiffs obviously knew, that NWP would never agree to modify the CBA or abandon the cap on pension contributions." *See* paper no. 12, at 10. Despite Defendant's attempt, it may not, under section 515, assert defenses to the formation of the agreement, "such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the agreement under labor law." *Gerber Truck Serv.*, 870 F.2d at 1153.

own benefit without the corporation's ratification of his action. *See Hartley v. United Mine Workers of America, Robena Local Union No. 6321,* 381 Pa. 430, 113 A.2d 239, 246 (1955).[9] Apparent authority is created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. *See id.* A party with whom the agent deals can "reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power." *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407, 410 (1968). The party asserting that an agent possesses power to act for another has the burden of proving it. *Id.*

▬ Plaintiff argues that Mr. Brink had apparent authority to sign the Standard Clause because he had signed the Standard Clause on behalf of the prior owner of the Pennsylvania plant and NWP never notified the Pension Fund that Mr. Brink lacked authority to sign documents relating to the Pension Fund after the Pennsylvania Plant was acquired. Plaintiff focuses, however, entirely on the actions of Mr. Brink and makes no mention of any actions taken by NWP in which Brink was held out, either to Plaintiff or the Local Union, as an agent possessing power. Plaintiff has also failed to address the declaration of Richard Hafets, labor attorney for NWP hired to represent the company in connection with its negotiations for the new CBA with the Local Union. In his declaration, Mr. Hafets'

states that he was the only person identified to have the authority to negotiate changes to the CBA and that this exclusive authority was communicated to the Local Union. *See* paper no. 12, ex. 1, ¶ 4. Based on the assertions of Mr. Hafets and Plaintiff's failure to identify even a single act of NWP by which it held Mr. Brink out as an agent authorized to modify the CBA, Plaintiff has failed to establish the lack of a genuine issue regarding the existence of apparent authority.

▬ Despite Plaintiff's failure to show as a matter of law that Brink acted with apparent authority, NWP may still be bound to the Standard Clause under the agency principle of ratification. Accordingly, Mr. Brink's actions, even his unauthorized acts, will have binding effect if NWP knew of, and accepted, the benefits of Mr. Brink's actions without taking steps to disavow them. *See* Restatement, (Second) Agency, § 98 (A receipt of benefits may constitute an affirmance by which a ratification is established); *see also Yarnall v. Yorkshire Worsted Mills,* 370 Pa. 93, 87 A.2d 192, 193 (1952) (holding that, under § 98 of Restatement, principal elected to ratify unauthorized act by accepting benefits of agreement with full knowledge of its terms and was therefore bound to terms of agreement); *Presbyterian Board of Relief for Disabled Ministers v. Gilbee,* 212 Pa. 310, 61 A. 925, 926 (1905) ("It is repugnant to every sense of justice and fair dealing that a principal shall avail himself of the benefits of an agent's act and at the same time repudiate his authority."). While knowledge of the material facts by the principal is a key element of establishing ratification, knowledge may be inferred if there exists "such information

---

9. The parties do not dispute that the Standard Clause was entered into in Pennsylvania, when Mr. Bomberger brought the agreement to Mr. Brink at the Pennsylvania plant. Because Maryland applies the rule of *lex loci* *contractus,* Pennsylvania law therefore applies to Plaintiff's claims surrounding the formation of the agreement. *See Kramer v. Bally's Park Place, Inc.,* 311 Md. 387, 390, 535 A.2d 466, 467 (Md.1988).

that a person of ordinary intelligence would infer the existence of the facts in question." *See* Restatement (Second) Agency, § 91, comment c. The Restatement provides the following illustration:

> [An unauthorized agent] A draws a check on P's account, signing: "P, by A." At the end of the month the bank returns the cancelled checks to P. There is no other evidence as to P's knowledge of the check. P does nothing. There is evidence from which it may be found that P is bound.

*See* Restatement (Second) Agency, § 91, illus. 7.

In this case, Defendant argues that both Mr. Hafets and the company were surprised to learn of the Standard Clause when it "surfaced" months after the Pennsylvania plant closed. *See* paper no. 12, ex. 1, ¶ 13. Mr. Hafets also claims that he was not informed *by the Union* of the agreement, nor did he or "the company" receive a copy of the Standard Clause. *See id.,* ¶ 11. Defendant does not, however, address whether Brink received a copy upon signing the agreement, or whether Hafets or the company were explicitly informed of Brinks' signing by anyone other than the Union.

Despite NWP's claims that it did not have actual knowledge of the Standard Clause, the record contains evidence that NWP possessed knowledge of the material facts surrounding the signing of the Standard Clause. Defendant admits that Brink was an agent of NWP for some purposes and had actual authority to sign the Standard Clause *if* it only mirrored the CBA. *See* paper no. 19, at 2–3. It does not explain, however, why Brink's knowledge of the presentation of the Standard Clause to him and his signature on behalf of NWP does not constitute evidence of knowledge on the part of NWP as to those facts. Furthermore, it is undisputed that ten days after Brink signed the Standard

Clause, NWP received a letter from John Beck on behalf of the Pension Fund, referencing the existence and exclusivity of the Standard Clause. *See* paper no. 9, ex. A. The August 9, 2002 letter explicitly states that the Standard Clause:

> language approved by the Board of Trustees is the 'sole and total agreement' between your company and the local union with respect to pensions or retirement. This Standard Clause must be attached to, or incorporated into, the collective bargaining agreement. Neither party to the collective bargaining agreement has the authority verbally or in writing to alter the provisions of the Standard Clause language. Any attempt to alter the Standard Clause or the Fund's rules, either in writing or in practice, will be ineffective, and may result in termination of participation in the Pension Fund. Please refer to the monthly remittance reports for instructions regarding the basis of contributions under the Standard Clause and the Pension Fund's rules.

*See id.* NWP also concedes that it received the instructions attached to the monthly remittance reports referenced in the August letter, *see* paper no. 19, at 3, n. 2., and the record establishes that Defendant received these instruction prior to entering the PCA. *See* paper no. 9, ex. E (monthly remittance report submitted to Plaintiff by Defendant on or about July 16, 2001). The instruction sheets make it equally clear that participating employers "do not have to pay contributions on hours in excess of the weekly maximum stated in the Standard Clause or CBA, *except in the case of severance pay and pro rata vacation, which are not limited by the weekly maximum.*" Paper no. 9, ex. F., ¶ III.B (emphasis added). Thus, even taking all inferences in the light most favorable to Defendant NWP, there exists uncontroverted evidence that NWP had "reason to know" of the existence of the Standard

Clause, its signing by Brink, and that it was a necessary component of its ability to participate in, and receive the benefits of, the Pension Fund. In fact, NWP did receive the benefits of participation with the Pension Fund. Accordingly, on the basis of ratified authority, summary judgment is granted in favor of Plaintiff.

### D. Damages

As asserted in its complaint, Plaintiff seeks to recover delinquent contributions in the amount of $56,613.86, plus interest, liquidated damages and reasonable attorney's fees and costs of the action as provided under 29 U.S.C. § 1132(g)(2).[10] In resisting Plaintiff's motion, Defendant refutes only the issues surrounding its obligation to make contributions on severance and accrued vacation pay; it does not challenge the amount of damages sought by Plaintiff. Therefore, pursuant to 29 U.S.C. § 1132(g)(2), Plaintiff will be awarded damages in the amount of $56,613.86 for delinquent contributions; $5,601.63 for interest accrued through July 31, 2003; $1,820.16 for interest accrued from August 1, 2003 until entry of this order (that is, 237 days X $7.68/day); $7,421.79 for liquidated damages of an amount equal to the total interest accrued; and reasonable attorney fees and costs of an amount to be determined after submission of a properly supported petition by Choice in accordance with Local Rule 109.

### IV. Conclusion

Based on the foregoing, Defendant's motion to dismiss will be denied and Plaintiff's motion for summary judgment will be granted. A separate order will follow.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, IT IS this 24th day of March, 2004, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Defendant New World Pasta Company to dismiss (paper no. 3) BE, and the same hereby IS, DENIED;

2. The motion for summary judgment of Plaintiff Bakery and Confectionery Union and Industry International Pension Fund (paper no. 9) BE, and the same hereby IS, GRANTED;

3. Judgment BE, and the same hereby IS, ENTERED in the amount of: $56,613.86 for delinquent contributions; $5,601.63 for interest accrued through July 31, 2003; $1,820.16 for interest accrued from August 1, 2003; $7,421.79 for liquidated damages of an amount equal to the total interest accrued; plus attorney fees and costs, provided that Plaintiff submits a properly supported petition within 14 days of this order in accordance with Local Rule 109; and

4. The clerk is directed to transmit copies of the Memorandum Opinion and this Order to counsel for the parties.

---

10. When a judgment is entered in favor of the plan, 29 U.S.C. § 1132(g)(2) provides that "the court shall award the plan" damages in the amount of:
   (A) the unpaid contributions,
   (B) interest on the unpaid contributions,
   (C) an amount equal to the greater of—
      (i) interest on the unpaid contributions, or

   (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent ... [of the unpaid contributions],
   (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
   (E) such other legal or equitable relief as the court deems appropriate.