Melvin J. PROCTOR, Jr.,
et al., Plaintiffs

v.

METROPOLITAN MONEY STORE
CORP., et al., Defendants.

No. RWT 07cv1957.

United States District Court,
D. Maryland.

Sept. 29, 2008.

Scott C. Borison, Janet Sue Legg, Legg Law Firm LLC, Frederick, MD, Peter A. Holland, The Holland Law Office PC, Annapolis, MD, Phillip R. Robinson, Civil Justice Inc., Baltimore, MD, for Plaintiffs.

Leticia Nicholls, Takoma Park, MD, pro se.

Sidney S. Friedman, Rosemary E. Allulis, Weinstock Friedman and Friedman PA, James K. Archibald, John Thomas Prisbe, Gregory Wasylak, Venable LLP, Baltimore, MD, Erwin Roderick E. Jansen, Jr., The Law Offices of Erwin R.E. Jansen LLC, Lanham, MD, Alvin I. Frederick, Daniel R. Hodges, Eccleston and Wolf PC, Hanover, MD, John M. Alten, John J. Haggerty, Ulmer and Berne LLP, Cleveland, OH, Joseph John Bottiglieri, Bonner Kiernan Trebach and Crociata, Washington, DC, for Defendants.

### MEMORANDUM OPINION

ROGER W. TITUS, District Judge.

Foreclosure is a terrifying prospect for any homeowner. Having fallen behind on mortgage payments and unable to make ends meet, fearful homeowners facing foreclosure are desperate to keep their homes but uncertain where to turn for help. As the rate of foreclosures has increased—reaching crisis proportions in recent months—so have instances of scam artists seeking to take advantage of these vulnerable homeowners.[1] Offering to stop foreclosures and allow owners to remain in their homes, the "foreclosure rescue scam" provides what seems like a solution to the immediate problem. Unfortunately, the victims eventually realize that the "rescuers" have left them in a much worse position than before, often stripped of their home equity and once again facing the prospect of losing of their home.[2]

Plaintiffs Melvin Proctor and Nadine McKenzie–Proctor ("Proctors"), Delores and Ronnell Wallace ("Wallaces"), and Dina Simon claim that they have been subjected to just such a foreclosure rescue scam. In their case, a group of "rescuers" allegedly duped them into transferring title to their homes, stripped Plaintiffs of their substantial home equity through excessive fees, and left them with the unattainable option of repurchasing their homes at a price well above the amount that they owed in the first place. As a result, Plaintiffs have filed a class action complaint[3] setting forth various claims under both federal and state law against numerous Defendants that they allege defrauded them.[4]

The Defendants fall into roughly four classes. First, at the heart of the alleged scam are the Defendants Joy J. Jackson, Kurt Fordham, and Jennifer McCall, along

---

1. *See, e.g., Johnson v. Wheeler,* 492 F.Supp.2d 492, 495–96 (D.Md.2007).

2. *See generally* FEDERAL TRADE COMMISSION, FTC FACTS FOR CONSUMERS (FEB.2008), FORECLOSURE RESCUE SCAMS: ANOTHER POTENTIAL STRESS FOR HOMEOWNERS IN DISTRESS, *available at* http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre42.pdf.

3. The Court has not yet determined whether this case may proceed as a class action.

4. Also pending before the undersigned is a criminal case in which the Indictment names some of the defendants to this civil case and describes the same or a similar scam. The Court, of course, takes no position as to the criminal culpability, if any, of any of the criminal defendants. At this stage in this civil case, the Court is merely determining the sufficiency of the Plaintiffs' allegations, if true, to establish civil liability.

with the corporate entities allegedly used by them to accomplish the scheme, Metropolitan Money Store Corporation ("Metropolitan") and Fordham and Fordham Investment Group, Limited ("Fordham & Fordham"). Second, Plaintiffs name certain "straw buyers" that were allegedly recruited to incur mortgage loans and take title to the homes, including Leticia Nicholls and Jamie A. Clark. Third, Plaintiffs have brought claims against the settlement agents and associated employees of the companies that allegedly closed the transactions: Valerina Tomlin and her settlement company, RTE Title & Escrow, LLC ("RTE"), as well as Alexander J. Chaudhry, Ali Farahpour, and Wilbur Ballesteros, all of whom were employed by Sussex Title, LLC, f/k/a Cap Title, LLC ("Sussex"). Finally, Plaintiffs name two title insurance companies, Chicago Title Insurance Company ("Chicago") and Southern Title Insurance Corporation ("Southern")(together, the "Title Companies"), that provided title insurance for certain of the transactions and which are alleged to be liable as principals for the actions of the settlement agents.

Before the Court are motions to dismiss Plaintiffs' Amended Complaint filed by four of the Defendants. Southern and Chicago have filed separate motions to dismiss, each asserting similar grounds that reflect their similar positions vis-a-vis Plaintiffs. Farahpour and Chaudhry—both allegedly involved in closing certain of the transactions at issue—have also filed separate motions to dismiss, Farahpour as to the entire Amended Complaint and Chaudhry as to Count VII. Both Farahpour and Chaudhry, however, have asserted at least one similar argument for dismissal, which is discussed below. For the reasons that follow, the Court will grant all four motions to dismiss and will dismiss the Amended Complaint as to all four Defendants. It will, however, grant leave to Plaintiffs to amend their Complaint a second time as to Defendants Chaudhry and Farahpour.

## I.

On July 24, 2007, Plaintiffs filed their Original Complaint. Following a first round of preliminary motions, the Court (1) dismissed all claims against Chicago; (2) dismissed certain claims against Sussex and Chaudhry; and (3) granted Plaintiffs leave to file an Amended Complaint.[5] Plaintiffs filed their Amended Complaint on January 21, 2008. Aside from adding Defendants Ballesteros and Farahpour, and dropping Sussex,[6] the Amended Complaint essentially brings the same claims as the Original Complaint, incorporating its previously separate claim for *respondeat superior* as a separate theory within the other counts.[7]

5. The Court also directed Plaintiffs not to file a separate count for *respondeat superior*, as they had done in the Original Complaint, but explained that Plaintiffs may pursue the *theory* of vicarious liability as part of their other claims.

6. On January 14, 2008, Plaintiffs filed a Notice of Bankruptcy Filing as to Sussex. (Paper No. 63). Sussex then filed a Suggestion of Bankruptcy on January 22, 2008, causing the Court to stay all proceedings as to it. (Paper Nos. 66 & 69). Acknowledging the bankruptcy filing, Plaintiffs state that Sussex is not a Defendant to the Amended Complaint, although they retain the factual allegations as to it. Am. Compl. ¶ 1 n. 1.

7. Specifically, the Amended Complaint brings the following counts against the Defendants listed in parentheses:

(I) Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)(against Jackson, McCall, Mr. Fordham, Metropolitan, Fordham & Fordham, RTE, Tomlin, Chaudhry, Ballesteros, Farahpour, Chicago, and Southern);

(II) Violation of RICO, 18 U.S.C. § 1962(c)(same Defendants as Count I);

On February 4, 2008, Chaudhry filed his Motion to Dismiss Count VII of Plaintiffs' First Amended Complaint for Failure to State a Claim Upon which Relief Can Be Granted. (Paper No. 72). On February 21, both Chicago and Southern filed their separate Motions to Dismiss Amended Complaint. (Paper Nos. 79 & 85). On April 4, 2008, Farahpour filed a Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to Plead Fraud with Particularity, and Failure to State a Claim Upon Which Relief Can Be Granted. (Paper No. 105). The Court heard argument on these motions at a hearing held on June 20, 2008.[8]

## II.

Although Plaintiffs have set forth lengthy allegations in their Amended Complaint, only an abbreviated review of the alleged facts is necessary at this time, given the grounds upon which the Court's decision rests. In sum, Plaintiffs allege

(III) Violation of RICO, 18 U.S.C. § 1962(d)(same Defendants as Count I);

(IV) Violation of the Federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* (All Defendants);

(V) Violation of the Maryland Protection of Homeowners in Foreclosure Act (PHIFA), Md.Code Ann., Real Prop. § 7–301 *et seq.* (All Defendants as to the Maryland subclass of Plaintiffs);

(VI) Declaratory and Injunctive Relief, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), with respect to PHIFA (Nicholls, Jones, and John Does 1–50 as to the Maryland subclass of Plaintiffs); and

(VII) Gross Negligence (RTE, Tomlin, Chaudhry, Farahpour, Ballasteros, Southern, and Chicago).

The Amended Complaint also added RTE, Tomlin, Chaudhry, Ballasteros, Farahpour, Chicago, and Southern to the RICO claims. Finally, Plaintiffs narrowed their claim for declaratory and injunctive relief to name just alleged straw purchasers.

the single largest mortgage scam in the Mid–Atlantic history which has bilked homeowners of millions of dollars of lost equity, threatens these families with imminent foreclosure, and involved the willful participation of so-called real estate professionals. . . .

Am. Compl. ¶ 1. The scam allegedly targeted vulnerable homeowners, especially African Americans, "who were already in dire financial straits, and who generally had few assets aside from the substantial equity in their home." *Id.* ¶¶ 41–42. Metropolitan allegedly advertised to distressed homeowners, arranged for straw purchasers to obtain mortgages for the purchase of title to the residences, and represented to homeowners that the transaction would help repair their credit. *Id.* ¶ 12. According to Plaintiffs, individual Defendants Jackson, McCall, and Mr. Fordham were allegedly involved personally in operating the scam. *Id.* ¶¶ 12, 21–23.

Arranging for mortgages in amounts "substantially more" than the amounts

8. Defaults have been entered against Metropolitan, Fordham & Fordham, Jackson, Mr. Fordham, Jones, and McCall. (Paper Nos. 67, 112). At the request of Plaintiffs, the Clerk also entered a default as to Ballesteros on August 1, 2008. (Paper Nos. 122 & 127.) Ballesteros subsequently filed a Suggestion of Bankruptcy and Plaintiffs moved to vacate the default. (Paper Nos. 130 & 131). On August 27, 2008, the Court granted Plaintiffs' motion, vacated the entry of default, and stayed all proceedings as to Ballesteros. (Paper Nos. 135 & 136).

The Court granted extensions of time through September 19, 2008, for Defendants Tomlin and RTE to answer the Amended Complaint. (Paper Nos. 118 & 129), and on September 16, 2008, the Plaintiffs filed Notices of Dismissal as to them (Paper Nos. 139 and 140). Clark is the only Defendant that has filed an Answer to the Amended Complaint. (Paper No. 71). Nicholls filed *pro se* an Answer to the Original Complaint, but has not answered the Amended Complaint. No motion for default against her has been filed.

owed, Metropolitan—with the assistance of Fordham & Fordham—allegedly would pay off the defaulted mortgage and retain the excess funds for itself and others involved. *Id.* ¶¶ 12–13. Such equity would have gone to the homeowner had the home actually gone to foreclosure or been sold on the open market. *Id.* ¶ 65. Plaintiffs were apparently told that they could reside in the homes for a year or more, with the option to repurchase the properties at the end of the period, *id.* ¶ 44 & Ex. 5, only to discover at the end of the period that their equity had been stripped and they would need to borrow much larger amounts than they had previously owed, *id.* ¶¶ 49, 71 & Ex. 10.

Jackson, McCall, and Mr. Fordham allegedly used Sussex—operated by Chaudhry, Farahpour, and Ballesteros—as their settlement and title insurance agent until August 2006, when they switched to RTE, operated by Tomlin. *Id.* ¶¶ 14–15, 24–27, 50. In the process, these agents allegedly prepared false HUD–1 settlement statements showing that expenses were being paid by the buyer when they were actually being paid by the seller, misappropriated and illegally disbursed funds, and structured the refinance transactions improperly as sales. *Id.* ¶¶ 50, 53–54, 58–60, 62, 70–72 & Ex. 10. The illegal disbursement of funds was allegedly accomplished by either (1) delivering checks—which were made payable to Plaintiffs—to Metropolitan, Fordham and Fordham, Jackson, McCall, and Mr. Fordham, who would then endorse the checks with forged signatures or (2) directly wiring the funds to bank accounts of the same Defendants. *Id.* ¶¶ 53, 59.

Sussex, Chaudhry, Farahpour, and Ballesteros allegedly conducted the settlements for the Proctor and Simon transactions, using the United States Mail and electronic wires to transfer and receive funds and documents related to the trans-

action. *Id.* ¶¶ 83–85, 140, 143–44. In these transactions, these Defendants allegedly failed to comply with the lender's closing instructions by, e.g., following Metropolitan's and/or Fordham & Fordham's closing instructions, not verifying down payment funds, accepting down payment funds from someone other than the borrower, conducting a settlement without the borrower present, failing to seek the lender's prior approval for conducting the transaction on behalf of the borrower through a power of attorney, making amendments to the disbursements on the HUD–1 settlement statement without the lender's prior approval, and intentionally preparing a false HUD–1 settlement statement. *Id.* ¶¶ 84, 142 & Ex. 12.

Similarly, with respect to the Wallace transaction, Plaintiffs allege that RTE and Tomlin used the electronic wires to receive funds and documents for the transaction. *Id.* ¶¶ 111, 119–21. RTE and Tomlin allegedly failed to comply with the lender's closing instructions by, e.g., conducting a closing without the borrower being present, failing to seek the lender's prior approval for conducting the transaction on the borrower's behalf by a power of attorney, making amendments to the HUD–1 settlement statement without prior approval of the lender, and accepting down payment funds from Metropolitan and Fordham and Fordham, instead of the purchaser. *Id.* ¶ 118.

As discussed in greater detail below, Plaintiffs allege that Sussex, Chaudhry, Farahpour, and Ballesteros, on the one hand, and RTE and Tomlin, on the other, acted as agents of Chicago and Southern, respectively, in these foreclosure rescue scam transactions. *Id.* ¶¶ 14–17, 24–27, 50–51, 55, 69. In sum, Plaintiffs allege that the Title Companies had control over their respective agents in these transactions, received title insurance premiums as a result, had the right to oversee and audit

these transactions, and voluntarily assumed oversight of disbursements by issuing closing protection letters. *Id.* ¶¶ 50, 69. Plaintiffs also allege that the Title Companies ratified the acts of their agents after benefitting from their illegal actions through receiving higher title insurance premiums than they otherwise would have received,[9] allowing those transactions to continue, and having never disgorged the proceeds of their title insurance premiums. *Id.* ¶ 50.

## III.

The pending motions to dismiss have been filed pursuant to both Federal Rules of Civil Procedure 12(b)(1) and Rule 12(b)(6).

### A. Lack of Subject Matter Jurisdiction Pursuant to Fed.R.Civ.P. 12(b)(1)

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may contend either that (1) the complaint fails to allege facts sufficient to establish jurisdiction or (2) the alleged jurisdictional facts are untrue. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). Where, as here, a defendant challenges the sufficiency of facts pleaded (as opposed to their veracity), the Court must accept the allegations as true and construe them in the light most favorable to the plaintiffs, just as it does when evaluating a motion to dismiss under Rule 12(b)(6). *Id.; Star Scientific Inc. v. R.J. Reynolds Tobacco Co.,* 174 F.Supp.2d 388, 391 (D.Md.2001). In such a posture, the Court will grant a 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."[10] *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991).

### B. Failure to State a Claim Pursuant to Fed.R.Civ.P. 12(b)(6)

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999). In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007), the Supreme Court declared the "retirement" of the long-cited "no set of facts" standard first announced in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[11] The Court in *Twombly* looked instead to whether the plaintiff stated "enough facts to state a claim to relief that is plausible on its face," *id.* at 1974, observing that "plaintiff's obligation to provide grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.* at 1964–65 (internal quotation marks omitted). In sum, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965.

No matter the standard used, the Court must consider all well-pleaded allegations in a complaint as true, *see Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and must construe

---

9. Plaintiffs allege that Chicago and Southern received excessive premiums because (1) the transactions were falsely structured as sales instead of refinancing transactions and (2) the purchase prices were inflated. *Id.* ¶¶ 50, 58, 62.

10. Resolution of jurisdictional questions must occur before deciding whether a plaintiff states a proper cause of action. *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

11. *Conley* stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. 99.

factual allegations in the light most favorable to the plaintiff, *see Lambeth v. Bd. of Comm'rs of Davidson County,* 407 F.3d 266, 268 (4th Cir.2005). Nevertheless, the Court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), conclusory allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir.2002)(internal quotation marks omitted).

**IV.**

Both Chicago and Southern move to dismiss the Amended Complaint, pursuant to both Fed.R.Civ.P. 12(b)(1) and 12(b)(6). As explained below, the Court will grant the motions because all of the claims in the Amended Complaint against the Title Companies, which are either based on a theory of *respondeat superior* or a theory of direct liability for failure to supervise their agents, fail to sufficiently allege an agency relationship that encompasses the underlying actions by the alleged settlement agents.

**A. Standing**

Both Chicago and Southern move to dismiss pursuant to Rule 12(b)(1), although it appears that only Chicago actually sets forth an affirmative argument relating to subject matter jurisdiction. Specifically, Chicago points out that the Amended Complaint alleges only that "Sussex, Chaudhry, Farahpour and Ballesteros ... requested a Commitment for Title Insurance from Chicago for" the *mortgage lenders and purchasers,* and does not allege any

contract for title insurance with the seller Plaintiffs. Am. Compl. ¶¶ 86, 145 & Ex. 14 & 29. According to Chicago, therefore, Plaintiffs lack standing to allege a claim against it.

■ The Court disagrees. Chicago is presumably urging the Court to find that the Title Companies owed *no duties* to any parties *except* for the lenders and purchasers to whom it provided title insurance. While it may be true that the Title Companies had no direct *contractual* duties to Plaintiffs, the asserted theory of their liability is that their title insurance agents—Sussex, Chaudhry, Farahpour, Ballesteros, RTE, and Tomlin—owed certain duties to Plaintiffs as settlement agents and that the Title Companies are liable for the agents' actions under a theory of *respondeat superior* and for failure to supervise. Although Plaintiffs' theory is separately vulnerable to attack on the *scope* of the agency relationships, this is an issue of the sufficiency of a claim and not the existence of subject matter jurisdiction. Whether the claim is sufficient or not, Plaintiffs at least have *standing* to assert that the Title Companies are liable for their agents' actions, so long as Plaintiffs have standing to assert the claims against the agents themselves—which of course they do.

**B. Vicarious Liability (Respondeat Superior)**

With respect to Plaintiffs' claims under a theory of *vicarious* liability, the Title Companies argue that Plaintiffs have failed to allege sufficient facts to establish that their title agents for these transactions also acted as their agents for purposes of settlement and closing services.[12] First, the Title Companies argue that their issuing agency contracts make clear that (a)

12. The Title Companies both add brief arguments at the end of their memoranda that Plaintiffs otherwise fail to state a claim. Because the Court will dismiss all claims against the Title Companies on other grounds, the Court declines to reach these alternative arguments at this time.

only a title agency appointment is being made and (b) the local settlement companies are not being appointed as an agent for closing activities. Second, they contend that neither (c) informing a local title agent of potential risks that may cause a future title loss or aggravate such a loss nor (d) conducting statutorily required audits of underwriting, claims, and escrow practices of a local title agent, alters the issuing agency relationship. Finally, they argue that the issuance of closing protection letters indemnifying lenders against improper settlement activities (e) cannot contribute to the finding of an agency relationship because, by their terms, the letters protect only the lenders to whom they are issued or the borrowers of such loans and (f) actually contradicts the existence of a broader agency relationship because such letters would not be necessary if such an agency relationship existed.

Plaintiffs allege generally that, at all times relevant to the Complaint, (1) "Sussex, Chaudhry, Farahpour and, Ballasteros[, on the one hand, and RTE and Tomlin, on the other,] were acting as agents of Chicago [and Southern, respectively,] and within the scope of their agency relationship with [these respective principals]." [13] Am. Compl. ¶¶ 16–17. The specific factual allegations underlying the general allega-

tion of a principal-agency relationship are reviewed below. In addition to pleading *respondeat superior*, Count VII also includes a claim against Chicago and Southern for gross negligence under a theory of *direct liability* based on their allege negligent failure to oversee their agents as required by federal and state law. *See id.* ¶ 331.

### i. Specific Agency Allegations as to Chicago

Plaintiffs' theory of agency for both Chicago and Southern is based in part on certain provisions contained in agreements in place between these purported agents and principals. For instance, Plaintiffs point to the following language from standard Chicago agency agreements [14]:

> In those instances where Agent closes real estate transactions and receives and disburses funds of others, Agent shall: ... c. disburse such funds only for the purposes for which they were entrusted; d. maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order; [and] f. reconcile monthly the control account and ledger records to the monthly bank statement.

Am. Compl. ¶ 16 & Ex. 1 ¶¶ 4.I. in first agreement and 4.G. in second.[15] The same

---

**13.** Moreover, all counts claiming liability of Chicago and Southern include the exact same allegations of agency. *See* Am. Compl. ¶¶ 244–45, 247–48 (Count I); ¶¶ 255–56, 258–59(II); ¶¶ 268–69, 271–72(III); ¶¶ 286–87, 289–90(IV); ¶¶ 302–03, 305–06(V); and ¶¶ 326–27, 329–30(VII).

**14.** Neither Chicago nor Southern challenges the accuracy of the agency agreements provided by Plaintiffs.

**15.** Although not cited by Plaintiffs in their Amended Complaint, their Opposition points out that the Chicago agency agreements also provide that the Agent agrees to indemnify the Principal from, *inter alia:*

> Any improper Closing or attempted Closing by Agent, including but not limited to:
> (i) loss or misapplication of customer funds, documents, or any other thing of value entrusted to Agent in any custodial or fiduciary capacity resulting in loss to Principal;
> (ii) failure to disburse properly or close in accordance with escrow and/or closing instructions;
> (iii) misappropriation of escrow or closing funds by Agent, its officers, subcontractors or employees;
> (iv) any loss pursuant to an Insured Closing Letter [or Closing Protection Letter] issued by Principal on behalf of Agent; or

agreements, however, disclaim any agency relationship beyond the provision of title insurance and specifically disclaim an agency relationship for the agent's closing activities:

> 1. APPOINTMENT OF AGENT. Principal hereby appoints Agent as a policy issuing agent of Principal for the *sole purpose* of issuing title insurance commitments, policies, endorsements and other title assurances....
>
> . . .
>
> 4.L. The parties hereto acknowledge that Agent is *not an agent for purposes of conducting a Closing,* [ [16] ] . . . however, because Principal may be subject to *allegations of* liability for acts of Agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow records, accounts and procedures. In addition, Agent agrees to provide to Principal . . . a copy of any audit conducted by any accounting firm with respect to Agent's escrow records, accounts or procedures.

*Id.* Ex. 1 (¶ 4.J. in second)(emphasis added).[17]

> The Amended Complaint adds:
>
> Chicago regularly sends out bulletins to its agents [and] maintains a website for its agents to access bulletins on many topics as well provides seminars (sic). Chicago gives directions to its agents beyond title issues that may arise in connection with title insurance policies. The bulletins have included directions on what type of disbursements should not be made, e.g., payments to non-sellers, the Maryland's [PHIFA] (sic), guidance against possible rescission by the homeowner under PHIFA and advising the agents that it is there to help the agents on issues beyond title defects but also the structures of transactions. As part of its involvement with the activities of its agents, Chicago regularly conducts audits of its agents that includes review of disbursements and other records.
>
> Upon information and belief, Chicago also contractually agreed to be responsible for the disbursements by issuing closing protection letters.

*Id.* ¶ 16 & Ex. 1 ¶ 10 (agent agrees to permit inspection of files "relating to the Closing of transactions involving a commitment to issue Principal's title assurances").

Chicago attaches to its motion a copy of the closing protection letter issued by it in connection with Jones's purchase of the Sapienza Drive property.[18] *See* Chicago Mem. at Ex. A. The closing protection letter, addressed to Argent Mortgage, provides that Chicago

> agrees to reimburse you for actual loss incurred by you in connection with [closings of real estate transactions in which you are to be . . . a lender secured by a mortgage . . . of an interest in land]

---

 (v) failure to disburse immediately available funds.

*Id.* ¶ 8.E (both). Finally, the second agency agreement contains a substituted Paragraph 9(i), *see* Schedule A, providing that the agency agreement may be terminated if, *inter alia,* "Agent materially deviates from the guidelines, instructions or escrow accounting standards of Principal furnished to Agent."

**16.** The term "Closing" is defined as "the handling and disbursement of settlement funds or the providing of settlement services." *Id.* Ex. 1 ¶ 7.H.

**17.** In Paragraph 4.K. of the second agreement, the title agent agrees to audits of its escrow accounts "from time to time."

**18.** The Court may consider the letter provided by Chicago on a motion to dismiss because it is referenced and relied upon in the Amended Complaint. *See New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.,* 18 F.3d 1161, 1164 (4th Cir.1994).

when conducted by [Cap Title, LLC] and when such loss arises out of: 1. Failure of [Cap Title] to comply with your written closing instructions to the extent they relate to ... (c) disbursement of settlement proceeds.... 2. Fraud or dishonesty of [Cap Title] in handling your funds or documents in connection with such closings.

If you are a lender protected under the foregoing paragraph, your borrower ... shall be protected as if this letter were addressed to your borrower.

### ii. Specific Agency Allegations as to Southern

Plaintiffs also point to RTE's obligation under the Southern agency agreement to [k]eep safely in accounts separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transactions in which Principal's title insurance is involved, disburse said funds only for the purposes for which same were entrusted and reconcile all such accounts not less frequently than monthly. Principal shall have the right to examine, audit and approve Agent's accounting procedures.

Am. Compl. ¶ 17 & Ex. 2 ¶ 4(f).[19] As Southern highlights, however, the standard "Issuing Agency Contract" between Southern and its local agents also states:

**2. APPOINTMENT OF AGENT:** Principal appoints Agent as an agent of Principal for the promoting and transacting of the business of title insurance in the State of Maryland and the District of Columbia....

. . .

**7. SETTLEMENTS:** It is understood and agreed that Agent is not an agent for Principal in connection with escrows, closings or settlements and that Agent will make no representations to the contrary.

. . .

**19. AGENCY LIMITATION:** Agent is not an agent for Principal in connection with escrows, closings or settlements and Agent will make no representations to the contrary. The relationship created by this contract does not extend to any escrow, closing or settlement business ... conducted by Agent; to title reports, opinions or certificates issued in the name of Agent or to any other activity of Agent that does not involve the Principal's assumption of liability for the condition of title.

*Id.* Ex. 2.

The Amended Complaint adds:

upon information and belief, Southern also provides it (sic) agents information on many topics and gives advice and direction to its agents beyond title issues that may arise in connection with title insurance policies.

As part of its involvement with the activities of its agents, Southern regularly conduct audits of its agents that includes review of disbursements.

*Id.* ¶ 17.

Finally, Plaintiffs provide copies of three closing protection letters issued by Southern to lenders. *Id.* ¶ 17 & Ex. 3. Specifically, the letters state that Southern

agrees to reimburse you for actual loss incurred by you in connection with [closings of Maryland real estate transactions in which you are to be ... a lender

---

19. Southern's agent agrees to indemnify the lender for, *inter alia*, "any improper closing or attempted escrow or closing by the Agent," including misapplication of funds resulting in loss to Principal, and/or "failure to disburse properly or close in accordance with escrow and/or closing instructions, and/or ... misappropriation of escrow or closing funds by Agent, its officers or employees." *Id.* Ex. 2 ¶ 8(d).

secured by a mortgage ... of an interest in land] when conducted by [RTE] and when such loss arises out of: ... 2. Fraud or dishonesty of [RTE] in handling your funds or documents in connection with such closings to the extent such fraud or dishonesty relates to the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land.

*Id.*

### iii. Analysis

■ As a preliminary matter, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed.R.Civ.P. 10(c). Although the Court in considering a motion to dismiss pursuant to Rule 12(b)(6) accepts well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff, the actual contents of a written instrument attached to the complaint prevail over the conflicting characterizations by a plaintiff. *See Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir.2005); 5 Wright & Miller, Fed. Prac. & Proc. § 1327 (observing that "by attaching an exhibit, the pleader often may foreclose recovery on a theory of relief that he claims is available to him since the document itself may reveal the existence of an insurmountable defense"); *see also Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir.2005)(recognizing Rule 10(c)).

■ " 'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " *Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039, 1047 (1999)(quot-

ing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)). Where a plaintiff's claim is dependent upon the existence of an agency relationship, the plaintiff has the burden of proving such a relationship, including its extent. *See id.* at 1048. Because the existence of an agency relationship is a factual matter under Maryland law, this Court evaluates—under the federal standards of Rule 12(b)(6)—whether the factual allegations, if construed in the light most favorable to Plaintiffs, are legally sufficient to establish an agency relationship. *See id.* (explaining that a plaintiff must produce "legally sufficient evidence of a principal-agent relationship" to survive summary judgment and reach a jury on the question).

### a. Whether Agents Acted Within Scope of Actual Agency Relationship

■ Whether an actual agency relationship exists "turns on the parties' intentions," as manifested by either express agreement or by inference from the actions and words of the purported principal and agent. *See id.* at 1047–48. Courts consider three factors to determine whether an agency relationship exists under Maryland law: (1) whether the agent is subject to the principal's right of control; (2) whether the agent has a duty to act primarily for the benefit of the principal; and (3) whether the agent holds a power to alter the legal relations of the principal. *Schear v. Motel Mgmt. Corp.*, 61 Md.App. 670, 487 A.2d 1240, 1248 (1985)(citing RESTATEMENT (SECOND) OF AGENCY §§ 12–14 (1958)). These factors are neither essential elements nor the only factors to consider but, rather, "should be viewed within the context of the entire circumstances of the transaction or relations."[20] *Green*, 735 A.2d at 1049.

---

**20.** Plaintiffs also point to the Maryland Civil Pattern Jury Instructions, which define a "principal" as "the person who has permitted or directed another person to act for the prin-

cipal's benefit and subject to the principal's direction and control" and an "agent" as "the person who has agreed to act for the princi-

■ The employment of an agent for purposes of issuing title insurance does not (at least by itself) establish an agency relationship for purposes of settlement and closing activities undertaken by that title agent.

> [A]n issuing [title insurance] agent may, in accordance with an agency contract, wear "two hats," one as an *agent* to issue or sell title insurer's insurance policies, and the other as a settlement agent to conduct closings *on his or her own behalf.* In such cases, the title insurer is responsible only for the title insurance issued; it cannot be held liable for the agent's participation in related closings or provision of escrow services.

*Nat'l Mortgage Warehouse, LLC v. Bankers First Mortgage Co.,* 190 F.Supp.2d 774, 780 (D.Md.2002) (citations omitted, emphasis added)(granting judgment as a matter of law to the title insurer where the agency agreement "expressly precluded [the title insurance agent] from conducting any settlement or closing business on behalf of [the insurer]"); *see also Sommers v. Smith & Berman, P.A.,* 637 So.2d 60, 61–62 (Fla. App. 4th 1994); *Cameron County Savings Assoc. v. Stewart Title Guar. Co.,* 819 S.W.2d 600, 603–05 (Tex.App.1991).

In addition to common law principles of agency, Plaintiffs also urge the Court to consider that Maryland law requires a title insurer to "conduct [annual] on-site review[s] of the underwriting, claims, *and escrow practices* of each title insurance producer appointed by the insurer as a principal agent as designated in the title insurance agency contract between the insurer and the producer."[21] Md.Code Ann., Ins. § 10–121(j)(1)(i)(emphasis added). The Maryland Attorney General has opined that this obligation extends beyond the agent's duties in providing title insurance:

> Funds are normally escrowed as part of a real estate settlement, to pay off existing mortgages, tax bills, and other obligations that might constitute a lien on the property. Misappropriation of such funds would adversely impact the title to property. Thus, the statute does not limit on-site reviews to tracking title insurance premiums. Rather, it contemplates that a title insurer will review the handling of escrowed funds by the agencies that conduct settlements of the transactions involving the insurer's policies.

85 Md. Op. Atty. Gen. 306, 2000 WL 1639436, at Pt. II.C. (Oct. 30, 2000). The Attorney General further explained that this legislation was enacted in response to "a number of high-profile cases . . . involving the misappropriation of funds by those handling real estate settlements. . . . [Its] purpose . . . was to police the management of funds handled at real estate settlements. Title insurance companies were identified as a key component in the oversight of

---

pal's benefit and who is subject to the principal's direction and control." Maryland Civil Pattern Jury Instruction 3.1 (4th ed.2004).

**21.** The review must include (1) review of the agent's "policy blank inventory and processing operations" and, (2) in the event the agent does not maintain separate accounts for each title insurer, verification that funds held on behalf of the title insurer are reasonably ascertainable from the books of account and records of the agent. *Id.* § 10–121(j)(1)(ii)–(iii) § 10–121(j)(1)(ii)–(iii).

The statute further requires that the reviewing insurer maintain written reports of all such reviews and file a report in writing with the Insurance Commissioner if it, as a result of a review, has reasonable cause to believe that a title agent has engaged in certain activities prohibited by law, e.g., misappropriation of money of a beneficiary, other fraudulent or dishonest practices, demonstration of lack of trustworthiness or competence, or forgery of another's name in an insurance transaction. Md.Code Ann., Ins. § 10–121(j)(2)–(3)(referencing Md.Code Ann., Ins. § 10–126).

those transactions." *Id.* at Pts. II.A. & C. "[T]he Legislature mandated that the title insurance industry undertake a measure of self-regulation. It charged each title insurer with monitoring certain business practices of its agents." *Id.* at II.C.

██ Turning to the application of these principles, the Court notes that Plaintiffs have at least addressed the facial deficiency in their Original Complaint; namely, their mere allegation that the settlement agents in question "were agents of [the title insurers] at all times relevant to the facts alleged herein, *as title agents,*" Orig. Compl. ¶ 296 (emphasis added), and *not* that such Defendants were agents of Chicago for purposes of settlement, closing, and escrow activities. As summarized above, Plaintiffs have now alleged that such settlement agents at all times were acting within the scope of their agency relationship with their respective title insurers and have attempted to support this conclusion with underlying factual allegations.

Nevertheless, the Court will grant the motions to dismiss of both Chicago and Southern because the factual averments supporting the allegation of this broader agency relationship are ultimately insufficient to state a claim that the settlement agents in question were, in fact, acting within the scope of their agency relationship when they performed the misdeeds attributed to them by Plaintiffs. In support of its argument that such a broader agency relationship existed, Plaintiffs cite to four sources that allegedly created agency obligations for the title insurers: (1) the agency agreements between the title insurers and the title agents; (2) certain actions allegedly undertaken to share information with its title agents in matters related to closing; (3) closing protection letters issued by the title insurers, and (4) duties imposed on insurers by Maryland statute.

First, there is no question that the language in the agency agreements precludes a finding of an *express* agency relationship encompassing settlement and closing activities. The Chicago agreement appoints the agent "for the *sole purpose* of issuing title insurance" and explicitly disclaims any broader relationship by stating that the agent "is *not an agent for purposes of conducting a Closing.*" Am. Compl. Ex. 1 ¶¶ 1 & 4.L. (in first agreement, 4.J. in second)(emphasis added). Similarly, the Southern agreement appoints the agent "as an agent of Principal for the promoting and transacting of the business of *title insurance*" and twice includes an understanding that the agent "is not an agent . . . in connection with escrows, closings or settlements" and that "Agent will make no representations to the contrary." *Id.* Ex. 2 ¶¶ 2, 7 & 19 (emphasis added).

██ While Chicago and Southern seem to argue that these "plain terms" are dispositive of the question at hand, this in fact is not the end of the inquiry. The Title Companies are of course correct that "[i]t is a cardinal rule of construction that the intention of the parties to a contract must prevail, unless inconsistent with some rule of law, and this intention must be gathered from the terms of the contract considered as a whole, and not from clauses considered separately." *Walton v. Washington County Hosp. Ass'n,* 178 Md. 446, 13 A.2d 627, 630 (1940). This proposition, however, simply begs the question as to what the intention of the parties is. As the Court of Appeals has stated, the parties' intention to create an agency may be express *or implied* and, as to the latter, may be manifested by inference from the words and conduct of the parties. *See Green,* 735 A.2d at 1047–48. Although the express disclaimer of an agency relationship is highly relevant to the inquiry, the Court must also consider the effect of other pro-

visions in the agreements, as well as other conduct of the parties, to determine the parties' true intent. Otherwise, parties could simply disclaim an agency relationship generally to avoid liability to third parties while agreeing to specific provisions that in fact bind each other to an arrangement that is the equivalent of principal and agent.[22]

 Nevertheless, the Court agrees with the Title Companies that these additional requirements in the agency agreements and other alleged conduct, such as the sharing of certain information that may be related to closing risks and the issuance of closing protection letters, even if true, is insufficient to establish a broader agency relationship as a matter of law. Addressing the closing protection letters first, the Court does not accept their issuance as evidence of an agency relationship. As one commentator has explained, a closing protection letter is issued precisely because, in its absence, a title insurer is *not* liable for the actions of its title insurance agent:

> A substantial majority of courts hold that if a title insurance company has not issued a closing protection letter, the title insurer has no liability for fraud or other misconduct by a settlement agent in connection with a real estate closing. Unless a lender's loss is covered by some provision of a title insurance policy, or unless a statute provides otherwise, the lender rather than the title insurer bears the risk of a loss caused by a settlement agent's misconduct.

James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT & INS. L.J. 845, 847 (2001)(footnotes omitted); *see also Nat'l Mortgage Warehouse*, 190 F.Supp.2d at 781 (holding that issuance of a closing protection letter does not cloak the title agent with apparent authority to conduct closings on the insurer's behalf). Far from evidencing an agency relationship, a closing protection cuts the other way, demonstrating the need for additional protection because of the absence of agency liability. Unless covered by such a letter's terms, which Plaintiffs are not, they may not rely on such indemnification.[23]

Turning to the other contractual requirements imposed by the Title Companies on their agents, the Court is also not satisfied that these terms alter the otherwise limited agency relationship. For in-

---

**22.** Chicago cites *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 198 A.2d 277, 283 (1964), for the proposition that,

> if reasonably possible, effect must be given to each clause [in a contract] so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

*See also DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 829 A.2d 626, 637 (2003). The same principle, however, applies to the provisions of the agency agreements cited by Plaintiffs because, under Maryland law, these agreed provisions must be considered in determining whether an agency relationship may be implied.

**23.** In addition, even absent express or implied agency authority, a principal is bound under the apparent authority of his agent "where the agent is acting within the scope of his usual employment, or is held out to the public, or to the other party, as having competent authority, although, in fact, he has, in the particular instance, exceed or violated his instructions, and acted without authority." *Salvatorian Mission House, Inc. v. Horn*, 210 Md. 475, 124 A.2d 268, 271 (1956). The Amended Complaint fails to state a claim based on apparent authority because there is no allegation that Plaintiffs had any contact with the title insurers or otherwise relied on any representation by them. *See Nat'l Mortgage Warehouse, LLC*, 190 F.Supp.2d at 780 (stating that "a court will look only to the conduct of the principal in determining ... apparent agency"); *see also B. P. Oil v. Mabe*, 279 Md. 632, 645, 370 A.2d 554 (1977).

stance, basic requirements such as that disbursements be made for the purposes for which they were entrusted are already required by law and, thus, do not evidence control. *See Brooks v. Euclid Sys. Corp.,* 151 Md.App. 487, 827 A.2d 887, 898 (2003)(holding that contractual requirements that "merely restated legally imposed duties governing every securities transaction" did not give sufficient control over the purported agent to create a principal-agent relationship). Additionally, general requirements concerning the basic structure of escrow accounts, the need for monthly reconciliations, access for audits, and indemnification, although indicia of some level of control by the title insurers, are primarily geared toward minimizing risk of a loss under the title insurance policy, a loss under a closing protection letter, and even *allegations* of vicarious liability like the ones raised here. Indeed, the Chicago agreement even explains that the agent must cooperate in audits because, *despite* the absence of an agency relationship, Chicago "may be subject to *allegations* of liability," not *actual* liability.

The alleged sharing of certain industry information—what could be deemed "best practices" tips—by the Title Companies goes hand-in-hand with these contractual requirements. *See Cameron County Savings Ass'n,* 819 S.W.2d at 604 (holding that "evidence of education, warnings, practical advice, and general information passing between real estate related businesses and their employees does not show agency" because "all shared an interest in cooperating and closing real estate deals"). Title insurers that have indemnified lenders have an interest in minimizing closing risks, as well as risks under the title insurance policies themselves. Other than title insurance premiums and the minimization of risk under closing protection letters, Plaintiffs have not alleged that any benefits inured to the Title Companies from such information sharing so as to suggest

a broader agency relationship. Accordingly, the Court cannot ignore the explicit limitations placed on these agency relationships through the agency agreements themselves.

In the end, the title agents here retained a tremendous amount of discretion on a day-to-day basis in the provision of settlement and closing services and were not acting primarily for the benefit of the title insurer in those activities. *See id.* at 900 (observing that the imposition of certain operating conditions on another party does not make that party an agent where the would-be agent "'is not deprived of his judgment in the execution of his duties'" (quoting *Schweizer v. Keating,* 150 F.Supp.2d 830, 839–41 (D.Md.2001))). The agents were simply incapable of altering their legal relationships to the Title Companies under the terms of the title insurance policies and closing protection letters. Rather, the allegations set forth by Plaintiff illustrate precisely the relationship seen in *National Mortgage* and other cases in which the settlement agent wears two hats, only one of which—his or her role in the provision of title insurance—involves a general agency relationship with the title insurance company sufficient to establish vicarious liability to any plaintiff. Plaintiffs have made no allegations that would permit a reasonable jury to conclude otherwise.

Finally, the Court also disagrees that the Maryland statutory requirement that title insurers perform annual reviews of their title agents alters the agency relationship for purposes of civil liability. As an initial matter, the Insurance Code disclaims that its licensing regime supersedes the contractual relations between an insurer and the title insurance agent, explaining that the latter's license "does not create any actual, apparent, or inherent authority in the holder to represent or commit an

insurer." Md.Code Ann., Ins. § 10–113(c). Moreover, contrary to Plaintiffs' assertions, the language in section 10–121(j) does *not* "in clear, unambiguous terms . . . expand[ ] the agency relationship." Plt. Opp. at 7. Although section 10–121(j) certainly imposes an oversight duty on title insurers, this provision neither (1) creates a cause of action for its breach or otherwise makes the title insurer the guarantor of closing activities nor (2) encompasses the type of detailed oversight and responsibility inherent in a common law agency relationship. As the Title Companies explain in their reply memorandum, such annual reviews will reveal only certain general information concerning overdraws, reconciliation of accounts, missing funds, and bad checks, but would not consider the unfairness of underlying disbursements (as is alleged here) or otherwise cover activities in such detail as to impute responsibility onto the title insurers for individual disbursements.[24] *See id.* § 10–121(j)(1)(ii)–(iii)(discussing checks at the agency level, not at transaction level).[25]

### b. *Whether Principals Ratified Agents' Actions*

■ Plaintiffs also allege that the Title Companies are liable because they ratified the acts of their agents. Am. Compl. ¶ 50. Specifically, Plaintiffs allege that Chicago and Southern accepted excessively high ti-

tle insurance premiums as a result of the settlements, *see id.* ¶¶ 50, 60, 62 & 69, paid hefty commissions to their agents from such premiums, *id.* ¶ 227, and never disgorged the proceeds of these inflated premiums or otherwise attempted to undo the wrongful conduct of the agents, *id.* ¶ 50. Plaintiffs argue that discovery in this case would potentially reveal further indications of ratification and also point to alleged efforts by Chicago and Southern to foreclose on Plaintiffs' homes. *See* Plt. Opp. at 24.

■ Even if an agent acts outside the scope of the actual or apparent agency relationship, a principal is bound by the unauthorized acts of the agent if the transaction is not promptly rejected or is ratified in whole or in part. *Smith v. Merritt Sav. & Loan, Inc.*, 266 Md. 526, 295 A.2d 474, 480 (1972); *Bakery & Confectionery Union v. New World Pasta Co.*, 309 F.Supp.2d 716, 728–29 (D.Md.2004). "Ratification requires an intention to ratify, and knowledge of all material facts." *Progressive Casualty Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 518 A.2d 151, 156 (1986)(internal citation omitted). "Intention to ratify may be inferred by words, conduct or silence on the part of the principal that reasonably indicates its desire to affirm the unauthorized act." [26] *Id.* (noting that receipt and retention of the benefits and

---

**24.** Like the closing protection letters discussed below, moreover, the imposition of the statutory requirement reveals the General Assembly's recognition that title insurers otherwise have no common law agency duty for such oversight.

**25.** In addition, even if the statute could create an agency relationship, Southern rightly points out that its inspection of RTE was not required under December 31, 2007, a full year after the Wallace transaction was consummated. In this manner, even if subsection 10–121(j) created some duty for which a cause of action existed, Southern had no such duty with respect to the Wallace transaction.

**26.** Plaintiffs also cite *Ehrlich v. Md. State Employees Union*, 382 Md. 597, 856 A.2d 669 (2004), which held that the Governor of Maryland must ratify a Memorandum of Understanding either through signature or some manner that demonstrates he both fully understood the terms and conditions of the agreement and expressed approval in an unmistakable and public manner. This case, however, is (1) unhelpful to Plaintiffs because it states a heightened standard for ratification and (2) is inapplicable because it deals specifically with statutory and constitutional requirements of gubernatorial ratification. *See id.* at 675–77.

failure to make a timely disaffirmance of an unauthorized transaction are circumstances indicating intent to ratify). Finally, "the existence of ratification is essentially a question of fact." *Smith*, 295 A.2d at 481.

The Court will grant the motions as to any claim based on a theory of ratification because Plaintiffs have not sufficiently alleged that the title insurers had knowledge of all material facts. *See Webb v. Duvall*, 177 Md. 592, 11 A.2d 446 (1940)("Acquiescence in, or the receipt and retention of the proceeds and benefits of, an unauthorized transaction do not amount to ratification if not accompanied by knowledge of the material facts concerning the transaction." (Internal quotation marks omitted.)). Plaintiffs do not attempt to address this prong of ratification except through vague assertions of the title insurers' roles in allegedly attempting to foreclose on Plaintiffs' homes, the relevance of which is not clear, and by asking generally for discovery.

### C. Gross Negligence Based on Failure to Oversee Agents

■ Aside from making a claim for gross negligence against Chicago and Southern under a theory of vicarious liability through a common law agency relationship, Plaintiffs also claim that the Title Companies were grossly negligent [27] under a direct liability theory for failure to oversee their agents "as required by state and federal law," through auditing their closings and otherwise performing "the oversight role that state governments required them to perform in order to protect persons such as the Named Plaintiffs … from misappropriations of funds and illegal disbursements." Am. Compl. ¶ 331. Although they do not cite any specific basis in law in their Amended Complaint for this oversight duty,[28] Plaintiffs in their opposition brief appear to point to their discussion of subsection 10–121(j) of the Maryland Insurance Article as the basis for this oversight duty. Plaintiffs also argue that Chicago and Southern have contested only the vicarious liability and, therefore, have failed to move to dismiss the claim on a theory of direct liability.

The Court will grant the motions to dismiss as to the claim for gross negligence on a theory of direct liability for two reasons. First, to the extent that this claim is based on common law duties of a principal to oversee one's agent, it fails because, as already explained at length, Plaintiffs have failed to sufficiently allege

27. The Court of Appeals of Maryland has explained that gross negligence "is the omission of that care 'which even inattentive and thoughtless men never fail to take of their own property,' it is a violation of good faith." *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 495 A.2d 838, 845–46 (1985)(quoting *Bannon v. B. & O. R. Co.*, 24 Md. 108, 124 (1866)). The Maryland Court of Special Appeals has more recently defined "gross negligence" as

An intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully

only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md.App. 463, 723 A.2d 454, 462 (1998)(quoting *Romanesk v. Rose*, 248 Md. 420, 237 A.2d 12 (1968)). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Artis v. Cyphers*, 100 Md.App. 633, 642 A.2d 298, 308 (1994).

28. Plaintiffs merely state that the Title Companies "had duties to oversee their agents under the law, as described above." Am. Compl. ¶ 331.

the existence of an agency relationship that encompasses the alleged misdeeds by the title agents here. Second, to the extent that this claim is based on an oversight duty established under Maryland insurance law and specifically subsection 10–121(j), the Court has already reviewed it and concluded that this law does not create a private civil cause of action or otherwise expand a title insurer's civil liability. Moreover, even if Plaintiffs could somehow establish the existence of such a privately enforceable duty, Plaintiffs do not make any specific factual allegations supporting such a theory. They do not, for instance, allege that Chicago or Southern failed to conduct the required reviews or, if they did, how exactly their reviews were grossly negligent.

## V.

■■■ The Court next turns to the motions to dismiss filed by Farahpour and Chaudhry, who are alleged to have been involved in the settlements of certain transactions. Both Farahpour and Chaudhry have filed motions to dismiss, Farahpour as to all counts [29] and Chaudhry only as to Count VII for gross negligence. The Court will consider their motions together because their principle argument [30] —with which the Court agrees—is the same: Plaintiffs have failed to state a claim against either of these Defendants because they have failed to make specific factual allegations as to how either of these individuals participated in the alleged scheme.

As a general matter, Farahpour highlights that Plaintiffs have dropped Sussex as a Defendant, yet retained all allegations against it, and simply added Farahpour and Ballesteros to all factual allegations that previously listed only Sussex and Chaudhry. In sum, Farahpour points out, nearly all allegations against him assert that certain acts or omissions were done by "Sussex, Chaudhry, Farahpour and Ballesteros," without any distinct allegations as to Farahpour individually. Farahpour contends that Plaintiffs did this after realizing their mistake in the Original Complaint of asserting that only Chaudhry acted on behalf of Sussex.[31] Farahpour

**29.** Farahpour moves to dismiss the Amended Complaint for failure to plead fraud with particularity, pursuant to Fed.R.Civ.P. 9(b), and for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).

**30.** Farahpour also asserts other grounds for dismissing specific counts. He moves to dismiss the RICO claims brought under 18 U.S.C. § 1962(a), (c), and (d), arguing that Plaintiffs (1) fail to plead with the particularity required by Fed.R.Civ.P. 9(b) at least one (if not all) of the elements common to claims made under the RICO subsections and (2) fail to allege necessary factual allegations to show the common element of either (a) a pattern of racketeering activity or (b) the collection of an unlawful debt, for all three Counts. Farahpour also moves to dismiss Count V because Plaintiffs fail to allege with any specificity facts that justify the application of PHIFA to him.

The Court declines to reach these alternative grounds for dismissal of these claims at this time. As explained herein, the basic pleading deficiencies of Plaintiffs are sufficient to dismiss the entire Amended Complaint as to both Farahpour and Chaudhry. The opportunity Plaintiffs will have to amend their Complaint and remedy the deficiencies found by the Court will likely result in the elimination of certain factual allegations as to one or more of these Defendants, and thus any conclusions that the Court reaches as to these specific arguments may be for naught. Nevertheless, Plaintiffs are forewarned that these Defendants will be permitted another motion to dismiss, including for these additional grounds raised by Farahpour in his current motion to dismiss.

**31.** Farahpour points to Plaintiffs' argument in opposition to Chaudhry's Motion to Dismiss the Original Complaint that "Chaudhry signed for Sussex right over that line [in Exhibit 8 of the Original Complaint]." A comparison of the notary signature in Exhibit 11 of the Amended Complaint, however, reveals

theorizes that Plaintiffs, unable to proceed against Sussex and not knowing the specific identity of the person(s) who acted on behalf of Sussex, have simply substituted a group of officers and employees for the corporate entity. The result, he explains, is that the Amended Complaint includes allegations that three persons "all delivered one check, recorded one deed, instructed one buyer to sign a document, and received one fax." Farahpour Mot. Dismiss at 6 (citing Am. Compl. ¶¶ 92, 97, 141–42).

Moreover, Farahpour adds, the only specific allegations as to any Sussex officers or employees show only that Ballesteros, and perhaps Chaudhry, were involved in the transactions. For instance, the signatures of the settlement agent on the HUD–1 settlement statement and the notarization of the deed for the Proctors at Exhibits 11 and 12 appear to be that of Ballesteros, as does the signature on the HUD–1 for the Simon transaction provided by Chaudhry with his motion.[32] Exhibit 32 also denotes that Ballesteros conducted the settlement. Moreover, Plaintiffs allege that Ballesteros "was personally involved in the Proctor transaction and many of the transactions involving the putative class members." See Am. Compl. ¶ 27. Finally, in their RICO summary, Plaintiffs allege that "Sussex and Mr.

Chaudhry," without naming Farahpour, closed transactions for the enterprise, including for the named Plaintiffs. See id. ¶¶ 199, 204.

In sum, Farahpour argues, there are no allegations specific to him sufficient to show that he (1) arranged for straw buyers, (2) took any illegal fees from Sussex's involvement in settling the real estate transactions at issue, (3) "channeled" kickbacks and unearned fees to unnamed "affiliates", (4) caused Sussex to improperly record documents, or (5) prepared false HUD–1 statements. In fact, Farahpour adds, the disbursement sheet supporting the allegation that the Proctor HUD–1 was falsified does not even mention him, nor do Plaintiffs allege that this document was ever shown to him or that he otherwise knew of its existence.

Chaudhry, on the other hand, moves only to dismiss Count VII for gross negligence, asserting similar grounds as Farahpour. Both Defendants argue that Plaintiffs assert only conclusions, not facts, in support of their claim for gross negligence, pointing out the allegation that each of them "actively participated in operating, maintaining and furthering the entity known as Sussex … to commit fraud and illegal practices complained of herein."[33] See Am. Compl. ¶ 25.

that it was most likely Ballesteros who signed Exhibit 8 of the Original Complaint, now included at Exhibit 12 of the Amended Complaint.

32. While Chaudhry recognizes Plaintiffs' allegation that he and Sussex "closed the real estate transactions of the Named Plaintiffs," see id. ¶ 199, 204, both Chaudhry and Farahpour argue that any allegation concerning their involvement in the closings is belied by other allegations. While the Court finds that Plaintiffs pleading deficiencies even as to Chaudhry require further amendment of their Complaint, the Court recognizes that Chaudhry had some involvement in the Proctor transaction as he apparently prepared and

signed the Proctor deed. See Am. Compl. Ex. 11. The Court takes no position at this time as to whether this act, if true, is sufficient to establish Chaudhry's liability.

33. Chaudhry and Farahpour also contend that Plaintiffs breached their own standard of care and were, therefore, contributorily negligent in failing to make inquiry as to any disbursements that were not made in accordance with HUD–1 forms that they signed. Given that it is a defendant's burden to prove contributory negligence, it is not appropriate to dismiss the claim on this basis at this stage in the proceedings where all the Court has before it is the Amended Complaint.

The Court will grant the motions of Farahpour and Chaudhry and dismiss the Amended Complaint as to both of them because Plaintiffs have failed to provide specific factual allegations as to either movant sufficient to establish liability. By naming Sussex and Chaudhry in their Original Complaint, Plaintiffs had essentially alleged that it was Chaudhry specifically who committed all facets of the wrongful conduct at issue. And while this might have been ultimately inaccurate, Plaintiffs cannot remedy the situation by simply listing everyone that *could have been* involved for every specific act that allegedly occurred on behalf of Sussex. At best, such pleading amounts to a conclusory allegation that Farahpour, Chaudhry, and Ballesteros were somehow responsible for the wrongful conduct of Sussex. At worst, the repeated refrain that all three individuals committed each and every act must be read as an allegation that *one of the three* did each act, an assertion that amounts to speculation and which is deficient under *Twombly.*

Plaintiffs do point to one allegation specific to Farahpour in Paragraph 18: "Upon information and belief, Farahpour was directly involved in the funding of the transaction as well as disbursements or supervised the activities." This lone specific allegation, however, is vague, speculative, and ultimately conclusory, making no specific factual allegations as to how he was "involved", what he did to fund the transaction, or what he did to supervise it.[34] Moreover, Plaintiffs' argument that it is appropriate to reference the three individuals as a group because they acted "in concert" misses the point that they cannot simply allege that a group of individuals all performed *specific acts.* The Court cannot permit Plaintiffs to go forward on a claim based on factual allegations in which basic questions of who did what are completely unclear.

Finally, Plaintiffs argue that an individual who participated, managed, and operated a corporate defendant, and who benefitted from the scheme is individually liable. Plaintiffs go on, however, to cite Maryland law stating that "corporate officers ... are personally liable for those torts which *they personally commit, or which they inspire or participate in,* even though performed in the name of an artificial body." *St. James Constr. Co. v. Morlock,* 89 Md. App. 217, 597 A.2d 1042, 1045 (1991)(quoting *Tedrow v. Deskin,* 265 Md. 546, 290 A.2d 799 (1972), emphasis added). This argument, however, only begs the question whether Farahpour and Chaudhry personally committed the torts in question or whether they inspired or participated in them, a question about which one can only speculate based on the allegations set forth in the Amended Complaint naming all three individuals associated with Sussex repeatedly. And while it is true that Farahpour and Chaudhry may be liable if they played a role in the scheme, the point is that Plaintiffs must allege what specifically each Defendant did (not what the group did) to fulfill his role in the scheme. Plain-

---

**34.** Plaintiffs in their Opposition brief attempt to save their claims as to Farahpour by introducing new allegations that he "set the entire Metropolitan Money Store scheme into motion" through the use of his mortgage lender's license through Money Tree Funding, LLC, an entity never mentioned in the Original or Amended Complaints. *See* Plt. Opp. Farahpour's Mot. Dismiss at 2–4, 7, 9. Plaintiffs even attach documents to their opposition pertaining to transactions never discussed previously involving Money Tree as a mortgage lender, along with other documents purporting to show Farahpour's involvement with Money Tree. *Id.* at Ex. 1–3. Making such allegations in an opposition brief to a motion to dismiss is inappropriate and is akin to amending the Complaint a second time without leave of the Court.

tiffs have not done so in their Amended Complaint.

## VI.

For the foregoing reasons, the Court, by separate order, will (1) grant the motions of Chicago and Southern on all counts and dismiss them from the case; (2) grant the motions of Farahpour and Chaudhry and dismiss all counts against both of them; and (3) grant leave for Plaintiffs to file a second amended complaint wherein they may attempt to remedy the deficiencies explained herein with respect to their claims against Farahpour and Chaudhry.[35]

## *ORDER*

Upon consideration of Defendant Alexander J. Chaudhry's Motion to Dismiss Count VII Plaintiffs' First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (Paper No. 72), Motion to Dismiss Amended Complaint by Defendant Chicago Title Insurance Company (Paper No. 79), Defendant Southern Title Insurance Corporation's Motion to Dismiss Plaintiffs' Amended Complaint (Paper No. 85), Defendant Ali Farahpour's Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to Plead Fraud With Particularity, and Failure to State a Claim Upon Which Relief Can Be Granted (Paper No. 105), and Plaintiffs' Motion to Certify a Class Against Defendants, Appoint Named Plaintiffs Class Representatives and Appoint Class Counsel (Paper No. 65), the oppositions and replies, and the argument of counsel heard on June 20, 2008, it is, for the reasons set forth in the accompanying Memorandum Opinion, this 29th day September, 2008, by the United States District Court for the District of Maryland,

ORDERED, that the Motion to Dismiss Amended Complaint by Defendant Chicago Title Insurance Company (Paper No. 79) is **GRANTED;** and it is further

ORDERED, that Defendant Southern Title Insurance Corporation's Motion to Dismiss Plaintiffs' Amended Complaint (Paper No. 85) is **GRANTED;** and it is further

ORDERED, that judgment for costs be entered in favor of Defendants Chicago Title Insurance Company and Southern Title Insurance Corporation; and it is further

ORDERED, that Defendant Alexander J. Chaudhry's Motion to Dismiss Count VII Plaintiffs' First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (Paper No. 72) is **GRANTED;** and it is further

ORDERED, that Defendant Ali Farahpour's Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to Plead Fraud With Particularity, and Failure to State a Claim Upon Which Relief Can Be Granted (Paper No. 105) is **GRANTED;** and it is further

ORDERED, that the Amended Complaint is **DISMISSED** as to the Defendants Chicago Title Insurance Company and Southern Title Insurance Corporation, without leave to further amend, and is **DISMISSED** as to the Defendants Alexander J. Chaudhry and Ali Farahpour, with leave to file a second amended complaint as to them as hereinafter provided; and it is further

ORDERED, that the Plaintiffs are **GRANTED** leave to file a second amended complaint in conformity with the Memorandum Opinion on or before November 14, 2008; and it is further

---

**35.** Because there is not yet a viable complaint before the Court, the Plaintiffs' Motion to Certify a Class Action (Paper No. 65) will be denied without prejudice to renew it in connection with a second amended complaint.

**ORDERED** that the Court having granted leave to file a second amended complaint, the Plaintiffs' Motion to Certify a Class Against Defendants, Appoint Named Plaintiffs Class Representatives and Appoint Class Counsel (Paper No. 65) is **DENIED WITHOUT PREJUDICE** to renew said motion as to the second amended complaint on or before November 14, 2008.