IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2012 Session

## THE 4-J L.P. v. SCARBROUGH & WEAVER, PLC ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 092437IV    Russell T. Perkins, Chancellor**

_____

**No. M2012-00284-COA-R3-CV - Filed January 31, 2013**

_____

In this case regarding title insurance company's duty to seller of real property, the trial court found no factual dispute regarding the escrow agent's apparent agency and granted summary judgment to title insurance company against seller of real property. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and FRANK G. CLEMENT, J., joined.

C. David Briley and Charles Robert Bone, Nashville, Tennessee, for the appellant, The 4-J, L.P.

Edward D. Russell, Nashville, Tennessee, for the appellee, Chicago Title Insurance Company.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

*Undisputed Facts*[1]

In July 2008, The 4-J, L.P. ("4-J"), a Tennessee limited partnership, contracted to sell three parcels of land to Hilltop Property Management ("Hilltop"). William Weaver, the

_____

[1] Because the trial court decided this case at the summary judgment stage, we base our statement of facts on the undisputed facts that the parties admitted. Additional facts gleaned from the pleadings, affidavits, oral arguments, and appellate briefs will be discussed as relevant to the issue on appeal.

owner and operator of W.G. Weaver Title & Escrow, LLC (collectively "Weaver") and of Guaranty Exchange Company, LLC ("Guaranty Exchange") agreed to act as 4-J's closing agent and escrow agent. Weaver prepared the warranty deeds that 4-J executed for the sale of the three parcels. The closing proceeds were to be held in a 1031 exchange[2] through Guaranty Exchange. On October 20, 2008, 4-J, having decided not to complete the 1031 exchange, asked Weaver to distribute the sale proceeds. Weaver eventually admitted that he stole the proceeds and squandered them in the stock market.

In connection with the escrow for the land sale between 4-J and Hilltop, Weaver issued a title insurance policy for each parcel of land to Hilltop and Hilltop's lender, Pinnacle National Bank. Chicago Title Insurance Company ("Chicago") underwrote these title insurance policies and Weaver, as title agent, sold them, collected the premiums, kept his portion of the premium for acting as Chicago's title agent, remitted Chicago's portion, and issued or countersigned policies for Chicago. The relationship between Chicago and Weaver was memorialized in an October 1, 2007 Issuing Agency Contract that names Chicago as principal and Weaver as agent and provides in pertinent part:

1. APPOINTMENT OF AGENT.

Principal hereby appoints Agent as a policy issuing agent of Principal *for the sole purpose of issuing title insurance commitments*, policies, endorsements and other *title* assurances approved by Principal and by all required regulatory agencies, now in existence or hereafter developed, relating to real property located and described in Schedule A.
. . .

3. DUTIES OF PRINCIPAL. Principal shall:

A. Furnish Agent forms of commitments, policies, endorsements and other forms required for transacting Agent's *title insurance business*.

B. Furnish Agent guidelines and instructions for transacting Agent's *title insurance business*.
. . .

4. DUTIES OF AGENT. Agent shall:

---

[2] A 1031 transaction is one in which the tax on the gain from the sale of real estate is deferred as long as proceeds from the sale are reinvested in other real estate within 180 days. The entity that holds the sale proceeds (here, Guaranty Exchange) is the "qualified intermediary." *See* 26 U.S.C. § 1031.

. . .

G. In those instances where Agent closes real estate transactions and receives and disburses funds of others, Agent shall:

(i) maintain said funds safely in accounts fully insured by an agency of the Federal Government and in accordance with applicable state laws;

(ii) maintain separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transaction(s) in which Principal's title insurance is involved;

(iii) disburse such funds only for the purpose for which they were entrusted;

(iv) maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order;

(v) maintain a control account showing total fiduciary liability for each escrow bank account; and

(vi) reconcile monthly the control account and ledger records to the monthly bank statement.

Principal shall have the right to examine, audit and approve Agent's accounting procedures to assure compliance with Principal's Escrow Accounting Manual . . . .

J. The parties hereto acknowledge that *Agent is not an agent of Principal for purposes of conducting a Closing*, as defined in Paragraph 7H hereof; however, *because Principal may be subject to allegations of liability* for acts of Agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow records, accounts and procedures.

K. Agent acknowledges and agrees that Principal, from time to time, shall conduct audits of the Agent's escrow accounts . . . and that the audits are intended for internal use by the management of Principal . . . .
. . .

7. LIMITATIONS ON AGENT'S AUTHORITY.

. . .

H. . . . The term "Closing" as used in this Contract shall mean: the handling and disbursement of settlement funds or the providing of settlement services.

(emphasis added).

Additionally, the parties do not dispute the following facts:

-Weaver, as owner and operator of Weaver Title, executed an authorization allowing the release of bank account information to Chicago concerning Weaver Title's escrow account.

-Weaver was never an employee, subsidiary, or wholly-owned entity of Chicago.

-Chicago did not have a contractual relationship with Guaranty Exchange.

-Guaranty Exchange was not Chicago's agent for any purpose, including the purpose of 1031 exchange transactions.

-Chicago did not participate in or have any interest whatsoever in Guaranty Exchange's 1031 business.

-Chicago did not underwrite or insure Guaranty Exchange's general liability or business activities.

-Chicago has never held any right, title, interest, or control in any of Guaranty Exchange.

-Chicago did not enter into any [written] contract or agreement[3] with 4-J to ensure 4-J received the loan proceeds from the sale of its property.

-Chicago was not a party to the agreement between 4-J and Guaranty Exchange.

---

[3] There was never a written or oral agreement between Chicago and 4-J. 4-J argues that Chicago "entered into an implied agreement with 4-J to ensure that its apparent agent, Weaver, did not mishandle escrow funds."

-The HUD-1 statements for the sale of the 4-J property list Weaver as the settlement agent.

-Besides listing Chicago as the party paid for title insurance, the HUD-1 statements for the sale of the 4-J property do not mention Chicago.

-Other than its portion of the title insurance premium, Chicago did not receive any funds from the 4-J transaction, nor did it prepare any documents or submit any documents for recording.

-Chicago, neither directly nor through an agent, received any money from the 4-J escrow, other than its portion of the premium for writing the title insurance policies issued in conjunction with the 4-J transaction.

-On March 20, 2009, Chicago learned for the first time that in November 2007 Weaver closed an escrow and wired $400,000 of its proceeds into his personal E-Trade bank account instead of using the proceeds to pay off a prior mortgage.

-Chicago was paid each net premium it was due from Weaver.

-Chicago did not learn of 4-J's allegations against Weaver until March 2009.

On December 21, 2009, 4-J filed a complaint alleging multiple causes of action against Chicago, William G. Weaver individually, Weaver Title & Escrow, Guaranty Exchange, J. Brad Scarbrough (Mr. Weaver's then law partner) and Scarbrough & Weaver, PLC. Chicago and 4-J are the only parties to this appeal. In November 2010, Chicago filed its motion for summary judgment. After a December 9, 2011 hearing and by order entered January 5, 2012, the trial court concluded that there was no genuine issue as to any material fact and that Chicago was entitled to judgment as a matter of law. Specifically, and as relevant to the issue[4] on appeal, the trial court found "that there is no express escrow agency

_____

[4] 4-J's complaint generally alleges negligence; the trial court found that because there was no duty of care owed by Chicago to 4-J, there existed no legal basis upon which to find Chicago negligent. The trial court further found that, "[a]lternatively, the proximate cause of [4-J's] injury was the criminal act of William G. Weaver, III, and not the failure of [Chicago] to revoke the title agency of [Weaver]." In its appellate brief, 4-J asserts for the first time that "[t]here are disputed facts precluding summary judgment on intervening cause." Our opinion does not reach this issue because 4-J did not plead the intervening cause doctrine in its original complaint. It is well-settled that issues not raised in the trial court may not be raised
(continued...)

between [Chicago] and [Weaver]" and "that there is no evidence that reasonable minds could differ as to a lack of apparent escrow agency between [Chicago] and [Weaver]."

4-J appeals from the trial court's final judgment.

STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we must determine whether factual disputes exist. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.*; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must negate an element of the opposing party's claim or "show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008).[5]

ANALYSIS

The parties do not dispute that Weaver, 4-J's *closing and escrow* agent, stole the money from 4-J's land sale and that Chicago (for whom Weaver acted as *title agent*) learned of Weaver's misdeed many months later.[6] None of 4-J's claims include direct allegations

---

[4](...continued)
for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

[5]Tennessee Code Annotated § 20-16-101 (2011), a provision that is intended to replace the summary judgment standard adopted in *Hannan*, is inapplicable to this case. *See Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 25 n.2 (Tenn. 2011) (noting that section 20-16-101 is only applicable to actions filed on or after July 1, 2011).

[6] Throughout the record, 4-J ambiguously refers to Weaver as Chicago's "agent." The events underlying this lawsuit implicate Weaver's escrow business. It is important to distinguish Weaver's role as escrow agent from his role as title agent. We note that in examining issuing agency contracts between a title insurer and its policy issuing agent, courts distinguish between these two roles. *See, e.g.*, *Cameron Cnty.*
(continued...)

against Chicago, which underwrote title insurance for the purchaser and lender in the underlying land sale. Faced with a valid issuing agency contract that by its express terms does not extend to Weaver's escrow, closing, or settlement business, 4-J does not argue that Weaver possessed actual authority to act as Chicago's escrow agent. Instead, 4-J premises Chicago's liability for Weaver's actions on an apparent agency theory, arguing that summary judgment was improper because there are "disputed facts upon which a jury could find that William [G.] Weaver was acting as [Chicago's] apparent agent when he closed the real estate transaction which resulted in [4-J's] loss."

> Apparent authority is:
>
> that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence. Apparent authority must be established through the acts of the principal, rather than those of the agent. Apparent authority is found where the principal, by his own acts or conduct, has clothed the agent with the appearance of authority. Having cloaked the agent with authority, the principal is accordingly estopped from denying liability for the acts of an agent acting within that authority.

*Milliken Grp., Inc. v. Hays Nissan, Inc.*, 86 S.W.3d 564, 569 (Tenn. Ct. App. 2001) (citations omitted).

In support of its argument that Weaver was acting as Chicago's apparent agent, 4-J points to a closing protection letter (CPL) that Chicago issued to Hilltop's lender, Pinnacle National Bank. The CPL lists Weaver as "issuing agent or approved attorney," identifies Chicago as "the company," and states:

> The Issuing Agent is the Company's agent only for the limited purpose of issuing title insurance policies. Neither the Issuing Agent nor the Approved Attorney is the Company's agent for the purpose of providing other closing or settlement services. The Company's liability for your losses arising from those other closing or settlement services is strictly limited to the protection expressly provided in this letter. Any liability of the Company for loss does

---

[6](...continued)
*Sav. Ass'n v. Stewart Title Guar. Co.*, 819 S.W.2d 600, 604 (Tex. Ct. App. 1991) (explaining that although an issuing agent may wear "two hats" in closing real property sales and selling title insurance, the title insurance company is not liable for the mishandling of real estate closings); *Bodell Constr. Co. v. Stewart Title Guar. Co.*, 945 P.2d 119, 125 (Utah Ct. App. 1997).

not include liability for loss resulting from the negligence, fraud or bad faith of any party to a real estate transaction other than an Issuing Agent or Approved Attorney . . . . However, this letter does not affect the Company's liability with respect to its title insurance binders, commitments or policies.

The CPL was issued for Pinnacle National Bank's benefit and 4-J was not covered by its terms. Nevertheless, 4-J argues that the CPL "is evidence of Weaver's apparent authority with regard to closing and escrow." We disagree and, in fact, find that the CPL demonstrates Weaver's lack of an apparent escrow agency relationship with Chicago. A closing protection letter serves to provide some protection to the lender, and, "in its absence, a title insurer is *not* liable for the actions of its title insurance agent." *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 738 (D. Md. 2008). Additionally:

> A substantial majority of courts hold that if a title insurance company has not issued a closing protection letter, the title insurer has no liability for fraud or other misconduct by a settlement agent in connection with a real estate closing. Unless a lender's loss is covered by some provision of a title insurance policy, or unless a statute provides otherwise, the lender rather than the title insurer bears the risk of a loss caused by a settlement agent's misconduct.

*Id.* (quoting James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT & INS. L.J. 845, 847 (2001) (footnotes omitted)). By issuing the CPL to Hilltop's lender, Chicago did not clothe Weaver with the appearance of authority to act as its agent with regard to closing and escrow.

Furthermore, if 4-J really believed that Weaver was acting as Chicago's agent for escrow, settlement, or closing transactions, then it was obligated to ascertain the scope of that agency. By undertaking to deal with a known or purported agent, a third person "is put upon inquiry as to the nature and scope of his powers, and must use due care to discover them or else suffer the consequences if they are exceeded." *Bells Banking Co. v. Jackson Ctr., Inc.*, 938 S.W.2d 421, 426 (Tenn. Ct. App. 1996) (quoting 2A C.J.S. *Agency* § 168 (1972)). In sum, we agree with the trial court that the record before us does not contain evidence on which reasonable minds could differ as to a lack of apparent escrow agency between Chicago and Weaver. We have thoroughly reviewed the entire record and conclude that the material facts do not create a genuine issue for trial. Therefore, summary judgment in favor of Chicago was appropriate.

CONCLUSION

We affirm the trial court's order granting summary judgment to Chicago. Costs of

appeal are assessed against 4-J, and execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE